**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| KIMBERLY WELLS<br><br>Appellant,<br><br>v.<br><br>RETINOVITREOUS ASSOCIATES, LTD. d/b/a MID ATLANTIC RETINA<br><br>Defendant. | : | CIVIL ACTION<br><br>No.: 16-2962 |

**<u>APPENDIX VOLUME 2 OF 3 VOLUMES</u>**
**<u>CONTAINING PAGE NUMBERS JA11 TRHOUGH JA214</u>**

Appellant, Kimberly Wells ("Appellant"), submits this Brief in support of his Appeal of the District Court's grant of Summary Judgment in favor of Appellees.


| **PAGE** | **DOCUMENT** |
|---|---|
| 11-17 | Federal Court Docket Entries |
| 18-26 | Civil Acton Complaint dated February 2, 2015 |
| 27-33 | Civil Action Complaint dated October 19, 2015 |
| 34-36 | Deposition Transcript of Kimberly Wells (6.5.15) (p1, 173, 174) |
| 37-119 | Deposition Transcript of Kimberly Wells (2.29.16) (p1, 35, 82-85, 90-94, 96, 98, 100-103, 105, 106, 108-110, 114-117, 121, 125, 127, 129, 130-143, 146, 147, 150-162, 166-173, 178-185, 194-201) |
| 120-140 | Deposition Candace Tracy Leonardo (8.6.15) (p1, 9, 10, 15, 23, 24, 30-34, 40-43, 45-50) |

| | |
|---|---|
| 141-168 | Deposition Transcript of Edward Weber (3.3.16) (p1, 5-8, 13-16, 22, 23, 28, 29, 32-35, 37-40, 44-49, 52) |
| 169-170 | Deposition of Janet Elaine Willis-Sellier (8.6.16) (p1, 35) |
| 171-214 | Deposition Transcript of Kristen Winkelspecht (3.3.16) (p1, 5-13, 17-28, 31-32, 36-40, 48-52, 55-64) |

Christine E. Burke, Esq.
Karpf, Karpf & Cerutti, P.C.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
Phone: (215) 639-0801
Fax: (215) 639-4970
Email: cburke@karpf-law.com
Attorney for Appellant

Date: October 18, 2016

CLOSED,APPEAL,STANDARD

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:15-cv-05675-JS

WELLS v. RETINOVITREOUS ASSOCIATES, LTD.
Assigned to: HONORABLE JUAN R. SANCHEZ
related Case: 2:15-cv-00478-JS
Case in other court: U.S.C.A., 16-02962
Cause: 29:2601 Family Medical Act of 1993

Date Filed: 10/19/2015
Date Terminated: 06/21/2016
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Employment
Jurisdiction: Federal Question

**Plaintiff**

**KIMBERLY WELLS**

represented by

**CHRISTINE E. BURKE**
KARPF, KARPF & CERUTTI, P.C.
3331 STREET ROAD
TWO GREENWOOD SQUARE, SUITE 128
BENSALEM, PA 19020
215-639-0801
Fax: 215-639-4970
Email: cburke@karpf-law.com
*ATTORNEY TO BE NOTICED*

**JONATHAN CHASE**
KARPF KARPF & CERUTTI PC
3331 STREET ROAD
TWO GREENWOOD SW SUITE 128
BENSALEM, PA 19020
215-639-0801
Email: jchase@karpf-law.com
*ATTORNEY TO BE NOTICED*

**TIMOTHY S. SEILER**
KARPF KARPF & CERUTTI
3331 STREET ROAD SUITE 128
BENSALEM, PA 19020
215-639-0801
Email: tseiler@karpf-law.com
*ATTORNEY TO BE NOTICED*

**ARI RISSON KARPF**
KARPF, KARPF & CERUTTI, P.C.

3331 STREET ROAD
TWO GREENWOOD SQUARE, SUITE 128
BENSALEM, PA 19020
215-639-0801
Fax: 215-639-4970
Email: akarpf@karpf-law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RETINOVITREOUS ASSOCIATES, LTD.**
*doing business as*
MID ATLANTIC RETINA

represented by **TRACY A. WALSH**
WEBER GALLAGHER SIMPSON STAPLETON FIRES & NEWBY LLP
2000 MARKET ST., 13TH FL
PHILADELPHIA, PA 19103
215-972-7900
Fax: 215-564-7699
Email: twalsh@wglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**CHARLES R. STARNES**
WEBER GALLAGHER SIMPSON STAPLETON FIRES & NEWBY LLP
2000 MARKET ST SUITE 1300
PHILADELPHIA, PA 19103
267-519-4976
Fax: 215-564-7699
Email: cstarnes@wglaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/19/2015 | 1 | COMPLAINT against RETINOVITREOUS ASSOCIATES, LTD. ( Filing fee $ 400 receipt number 0313-10920199.), filed by KIMBERLY WELLS.(KARPF, ARI) (Entered: 10/19/2015) |
| 10/19/2015 | 2 | REQUEST FOR WAIVER of Service sent to Retinovitreous Associates, Ltd. d/b/a Mid Atlantic Retina on 10/19/2015 by KIMBERLY WELLS. Waiver of Service due by 11/18/2015. (KARPF, ARI) (Entered: 10/19/2015) |
| 10/19/2015 | 3 | NOTICE of Appearance by CHRISTINE E. BURKE on behalf of KIMBERLY WELLS (BURKE, CHRISTINE) (Entered: 10/19/2015) |

| | | |
|---|---|---|
| 10/19/2015 | | DEMAND for Trial by Jury by KIMBERLY WELLS. (jwl, ) (Entered: 10/19/2015) |
| 10/21/2015 | 4 | NOTICE of Appearance by TRACY A. WALSH on behalf of RETINOVITREOUS ASSOCIATES, LTD. with Jury Demand and Certificate of Service (Attachments: # 1 Certificate of Service)(WALSH, TRACY) (Entered: 10/21/2015) |
| 10/21/2015 | 5 | Disclosure Statement Form pursuant to FRCP 7.1 with Certificate of Service by RETINOVITREOUS ASSOCIATES, LTD.. (Attachments: # 1 Certificate of Service)(WALSH, TRACY) (Entered: 10/21/2015) |
| 10/21/2015 | 6 | WAIVER OF SERVICE Returned Executed by KIMBERLY WELLS. RETINOVITREOUS ASSOCIATES, LTD. waiver sent on 10/19/2015, answer due 12/18/2015. (KARPF, ARI) (Entered: 10/21/2015) |
| 10/27/2015 | 7 | ORDER THAT THE ABOVE-CAPTIONED CASE IS REASSIGNED FROM THE CALENDAR OF THE HONORABLE ANITA B. BRODY TO THE CALENDAR OF THE HONORABLE JUAN R. SANCHEZ, AS RELATED TO KIMBERLY WELLS VS. RETINOVITREOUS ASSOCIATES, LTD., C.A. NO. 15-CV-0478. SIGNED BY MICHAEL E. KUNZ, CLERK OF COURT ON 10/26/15. 10/27/15 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 10/27/2015) |
| 11/11/2015 | 8 | NOTICE of Appearance by CHARLES R. STARNES on behalf of RETINOVITREOUS ASSOCIATES, LTD. with Jury Demand and Certificate of Service(STARNES, CHARLES) (Entered: 11/11/2015) |
| 12/17/2015 | 9 | *Defendant's* ANSWER to Complaint together with Affirmative Defenses by RETINOVITREOUS ASSOCIATES, LTD. Jury Demand, Certificate of Service. (WALSH, TRACY) Modified on 12/21/2015 (tjd). (Entered: 12/17/2015) |
| 12/18/2015 | 10 | ORDER THAT A RULE 16 CONFERENCE WILL BE HELD ON 1/11/2016, AT 11:30 AM, IN COURTROOM 11A, ETC. SIGNED BY HONORABLE JUAN R. SANCHEZ ON 12/18/2015. 12/18/2015 ENTERED AND COPIES E-MAILED. (amas) (Entered: 12/18/2015) |
| 12/18/2015 | 11 | NOTICE of Appearance by TIMOTHY S. SEILER on behalf of KIMBERLY WELLS (SEILER, TIMOTHY) (Entered: 12/18/2015) |
| 12/18/2015 | 12 | NOTICE of Appearance by JONATHAN CHASE on behalf of KIMBERLY WELLS (CHASE, JONATHAN) (Entered: 12/18/2015) |
| 12/22/2015 | 13 | JOINT STIPULATION AND ORDER REGARDING CONFIDENTIALITY WITH COURT APPROVAL. SIGNED BY HONORABLE JUAN R. SANCHEZ ON 12/22/15. 12/22/15 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 12/22/2015) |
| 01/11/2016 | 14 | ORDER THAT DISCOVERY DEADLINE IS 3/23/2016. DISPOSITIVE MOTIONS DUE BY 4/27/2016. A TELECONFERENCE TO DISCUSS SETTLEMENT SHALL TAKE PLACE ON 5/18/2016 AT 11:00 A.M. MOTIONS IN LIMINE DUE BY 5/25/2016. PLAINTIFF'S PRETRIAL MEMO DUE BY |

| | | |
|---|---|---|
| | | 6/2/2016. DEFENDANT'S PRETRIAL MEMO DUE BY 6/2/2016. FINAL PRETRIAL CONFERENCE SET FOR 6/6/2016 AT 10:00 A.M. IN COURTROOM 11A; TRIAL POOL SET FOR 6/13/2016, ETC. SIGNED BY HONORABLE JUAN R. SANCHEZ ON 1/11/16. 1/12/16 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 01/12/2016) |
| 01/12/2016 | 15 | Minute Entry/Report of Rule 16 Conference for proceedings held before HONORABLE JUAN R. SANCHEZ on 1/11/16. (kw, ) (Entered: 01/12/2016) |
| 04/27/2016 | 16 | MOTION for Summary Judgment filed by RETINOVITREOUS ASSOCIATES, LTD..Brief, Certificate of Service. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibits B-C, # 3 Exhibit Exhibits D-H, # 4 Exhibit Exhibit I, Part 1, # 5 Exhibit Exhibit I, Part 2, # 6 Exhibit Exhibits J-P, # 7 Exhibit Q-cc)(STARNES, CHARLES) (Entered: 04/27/2016) |
| 04/28/2016 | 17 | EXHIBIT Z in support of deft's motion for summary judgment, filed by DEFT RETINOVITREOUS ASSOCIATES, LTD. (FILED UNDER SEAL) (kw, ) (Entered: 04/29/2016) |
| 05/11/2016 | 18 | BRIEF in Opposition re 16 MOTION for Summary Judgment filed by KIMBERLY WELLS. (Attachments: # 1 Plaintiff's Statement of Material and Disputed Facts, # 2 Exhibits A through Q, # 3 Plaintiff's Responses to Defendant's Statement of asserted Material and Non-Disputed Facts, # 4 Certificate of Service)(BURKE, CHRISTINE) Modified on 5/12/2016 (lisad, ). (Entered: 05/11/2016) |
| 05/18/2016 | 19 | RESPONSE to Alleged Counter Statement of Facts re 16 MOTION for Summary Judgment *Certificate of Service* filed by RETINOVITREOUS ASSOCIATES, LTD.. (Attachments: # 1 Exhibit Exhibit 1-5, # 2 Exhibit Exhibit 6-10, # 3 Exhibit Exhibit 11-20)(STARNES, CHARLES) Modified on 5/19/2016 (lisad, ). (Entered: 05/18/2016) |
| 05/19/2016 | 20 | MOTION for Leave to File *Surreply* filed by KIMBERLY WELLS.Certificate of Service. (Attachments: # 1 Exhibit A: Proposed Surreply Brief)(BURKE, CHRISTINE) (Entered: 05/19/2016) |
| 05/24/2016 | 21 | ORDER THAT PLFF'S MOTION FOR LEAVE TO FILE A SURREPLY IN FURTHER OPPOSITION TO DEFT'S MOTION FOR SUMMARY JUDGMENT (DOC. 20) IS GRANTED. THE PROPOSED SURREPLY ATTACHED AS EXHIBIT A TO WELLS' MOTION SHALL BE DEEMED FILED. SIGNED BY HONORABLE JUAN R. SANCHEZ ON 5/24/16.5/24/16 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 05/24/2016) |
| 05/24/2016 | 22 | Proposed Surreply in further opposition to deft's motion for summary judgment, Certificate of Service, filed by PLFF KIMBERLY WELLS. (kw, ) (Entered: 05/24/2016) |
| 05/25/2016 | 23 | MOTION in Limine *seeking to prohibit the introduction or discussion of administrative agency investigations, notices, and/or determinations and/or the lack of any agency findings* filed by KIMBERLY WELLS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit A-D)(CHASE, JONATHAN) |

| | | |
|---|---|---|
| | | (Entered: 05/25/2016) |
| 05/25/2016 | 24 | MOTION in Limine *seeking to prohibit the introduction of unemployment benefits at trial* filed by KIMBERLY WELLS.Memorandum, Certificate of Service. (CHASE, JONATHAN) (Entered: 05/25/2016) |
| 05/25/2016 | 25 | MOTION in Limine *seeking to exclude any testimony or evidence about or concerning the fact that Plaintiff voluntarily dismissed or withdrew the underlying claims in her February 2015 federal lawsuit* filed by KIMBERLY WELLS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit A-C)(CHASE, JONATHAN) (Entered: 05/25/2016) |
| 05/25/2016 | 26 | MOTION in Limine *seeking to prohibit the introduction or discussion of her application for and denial of social security disability benefits and supplemental security income* filed by KIMBERLY WELLS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit A-B)(CHASE, JONATHAN) (Entered: 05/25/2016) |
| 05/25/2016 | 27 | MOTION in Limine *seeking to prohibit the introduction of information, examination or documents about or concerning evidence of prior litigation* filed by KIMBERLY WELLS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit A)(CHASE, JONATHAN) (Entered: 05/25/2016) |
| 05/25/2016 | 28 | MOTION in Limine filed by RETINOVITREOUS ASSOCIATES, LTD..Certificate of Service. (Attachments: # 1 Exhibit Exhibits 1-2)(STARNES, CHARLES) (Entered: 05/25/2016) |
| 05/31/2016 | 29 | EXHIBIT 2 in support of deft's motion in limine, filed on 5/25/2016 (Doc. No. 28), filed by DEFT RETINOVITREOUS ASSOCIATES, LTD. (FILED UNDER SEAL)(kw, ) (Entered: 06/01/2016) |
| 06/01/2016 | 30 | RESPONSE in Opposition re 28 MOTION in Limine filed by KIMBERLY WELLS. (BURKE, CHRISTINE) (Entered: 06/01/2016) |
| 06/01/2016 | 31 | Proposed Jury Instructions by RETINOVITREOUS ASSOCIATES, LTD.. Certificate of Service (STARNES, CHARLES) (Entered: 06/01/2016) |
| 06/01/2016 | 32 | Proposed Voir Dire by RETINOVITREOUS ASSOCIATES, LTD.. Certificate of Service (STARNES, CHARLES) (Entered: 06/01/2016) |
| 06/02/2016 | 33 | PRETRIAL MEMORANDUM by RETINOVITREOUS ASSOCIATES, LTD.. Certificate of Service (Attachments: # 1 Exhibit Exhibit A)(STARNES, CHARLES) Modified on 6/3/2016 (lisad, ). (Entered: 06/02/2016) |
| 06/02/2016 | 34 | PRETRIAL MEMORANDUM by KIMBERLY WELLS Certificate of Service. (Attachments: # 1 Plaintiff's Proposed Trial Exhibits)(BURKE, CHRISTINE) (Entered: 06/02/2016) |
| 06/02/2016 | 35 | Proposed Verdict Sheet by KIMBERLY WELLS.. (BURKE, CHRISTINE) (Entered: 06/02/2016) |

| | | |
|---|---|---|
| 06/02/2016 | 36 | Proposed Verdict Sheet by RETINOVITREOUS ASSOCIATES, LTD... Certificate of Service (STARNES, CHARLES) (Entered: 06/02/2016) |
| 06/02/2016 | 37 | RESPONSE to Motion re 24 MOTION in Limine *seeking to prohibit the introduction of unemployment benefits at trial*, 27 MOTION in Limine *seeking to prohibit the introduction of information, examination or documents about or concerning evidence of prior litigation*, 26 MOTION in Limine *seeking to prohibit the introduction or discussion of her application for and denial of social security disability benefits and supplemental security income*, 25 MOTION in Limine *seeking to exclude any testimony or evidence about or concerning the fact that Plaintiff voluntarily dismissed or withdrew the underlying claims in her February 2015 federal lawsuit*, 23 MOTION in Limine *seeking to prohibit the introduction or discussion of administrative agency investigations, notices, and/or determinations and/or the lack of any agency findings Certificate of Service* filed by RETINOVITREOUS ASSOCIATES, LTD.. (Attachments: # 1 Exhibit Exhibits 1-3)(STARNES, CHARLES) (Entered: 06/02/2016) |
| 06/06/2016 | 38 | Minute Entry/Report of Final Pretrial Conference for proceedings held before HONORABLE JUAN R. SANCHEZ on 6/6/16. (kw, ) (Entered: 06/07/2016) |
| 06/21/2016 | 39 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE JUAN R. SANCHEZ ON 6/21/16. 6/21/16 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 06/21/2016) |
| 06/21/2016 | 40 | ORDER THAT DEFT'S MOTION FOR SUMMARY JUDGMENT (DOC. 16) IS GRANTED. JUDGMENT IS ENTERED IN FAVOR OF DEFT AS TO ALL CLAIMS. THE CLERK OF COURT IS DIRECTED TO MARK THIS CASE CLOSED.SIGNED BY HONORABLE JUAN R. SANCHEZ ON 6/21/16. 6/21/16 ENTERED AND COPIES E-MAILED.(kw, ) (Entered: 06/21/2016) |
| 06/24/2016 | 41 | NOTICE by KIMBERLY WELLS re 40 Order (Memorandum and/or Opinion), *Notice of Appeal to the Third Circuit Court of Appeals* (BURKE, CHRISTINE)*FILED IN ERROR BY ATTORNEY; ATTORNEY TO RE-FILE USING CORRECT EVENT* Modified on 6/27/2016 (lisad, ). (Entered: 06/24/2016) |
| 06/27/2016 | 42 | NOTICE OF APPEAL re 39 Memorandum/Opinion, 40 Order (Memorandum and/or Opinion), by KIMBERLY WELLS. Copies to Judge, Clerk USCA, Appeals Clerk. Certificate of Service. (BURKE, CHRISTINE) Modified on 6/27/2016 (lisad, ). (Entered: 06/27/2016) |
| 06/27/2016 | 43 | Clerk's Notice to USCA, re: 42 Notice of Appeal. (kw, ) (Entered: 06/27/2016) |
| 06/27/2016 | | USCA Appeal Fees received $505.00 receipt number PPE142653, re: 42 Notice of Appeal filed by KIMBERLY WELLS (kw, ) (Entered: 06/28/2016) |
| 06/29/2016 | | NOTICE of Docketing Record on Appeal from USCA, re: 42 Notice of Appeal filed by KIMBERLY WELLS. USCA Case Number 16-2962 (kw, ) (Entered: 06/29/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/14/2016 14:52:08 | | | |
| **PACER Login:** | kk1231:3040210:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:15-cv-05675-JS |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KIMBERLY WELLS<br>1501 Little Gloucester Rd. E23<br>Blackwood, NJ 08012<br><br>Plaintiff,<br><br>v.<br><br>RETINOVITREOUS ASSOCIATES, LTD.<br>d/b/a MID ATLANTIC RETINA<br>4060 Butler Pike<br>Plymouth Meeting, PA 19462<br><br>Defendant. | : | CIVIL ACTION<br><br>No.: 15-478<br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. This action has been initiated by Kimberly Wells (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against Retinovitreous Associates, Ltd. for violations of the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), the Americans with Disabilities Act ("ADA" -42 USC §§ 12101 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA" - 43 P.S. §§ 951 *et. seq.*). [1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff will move to amend her instant lawsuit to include claims under the Pennsylvania Human Relations Act once her administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission. Any claims under the PHRA though would mirror the instant ADA claims identically.

## **JURISDICTION AND VENUE**

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

## **PARTIES**

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. Defendant Retinovitreous Associates, Ltd. a retina practice with locations in Pennsylvania, New Jersey and Delaware, including a location in Philadelphia, PA at which Plaintiff works.

8. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

9. Defendant has and continues to employ over 50 employees per calendar year for at least the last 5 years, and Defendant engages in a variety of business relationships generating revenue by engaging in the healthcare industry.

**FACTUAL BACKGROUND**

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth infull.

11. Plaintiff has worked for Defendant since on or about August 8, 2011.

12. At all times relevant herein, Plaintiff has been employed with Defendant as a Ophthalmic Technician, wherein she performs duties such as cleaning and stocking all clinical rooms on a daily basis and performing various exams and testing on patients daily.

13. In or about January of 2013, Plaintiff was diagnosed with Multiple Sclerosis, which at times causes her to experience numbness in her hands, dizziness, fatigue, and pain.

14. Plaintiff's aforementioned health conditions, at times, also limits her ability to perform some daily life activities, including but not limited to working, performing manual tasks, walking, stooping, bending, and lifting.

15. Despite her aforementioned health conditions and limitations, Plaintiff is able to perform the functions of her job well with Defendant; however, Plaintiff does require reasonable accommodations for her disability (as discussed *infra*).

16. After being diagnosed with MS, Plaintiff apprised her management of her health conditions and aforementioned limitations.

17. In or about February of 2013, Plaintiff requested from Defendant the ability to take intermittent FMLA leave to care for and treat for her aforementioned serious health conditions.

18. Since apprising Defendant of her aforementioned health conditions, limitations, and need for accommodations, Plaintiff has and continues to be treated in a hostile manner by Defendant's management, including but not limited to being subjected to discriminatory references about her health conditions, being issued negative performance evaluations, and being denied upward mobility on multiple occasions.

19. In or about April of 2014, Plaintiff applied for an available position within Defendant as a Ophthalmic Photographer, a position which she had already been training and performing in during the months preceding her application for such position.

20. Plaintiff had requested to be placed in the Ophthalmic Photographer position on multiple occasions as a reasonable accommodation for her aforementioned health conditions and also as a promotion.

21. Plaintiff expressed to Defendant's management over a period of several weeks that being able to work in the Ophthalmic Photographer position would better suit her aforementioned disabilities, as it required less physical labor and therefore put less stress on Plaintiff's body (as compared to her position as a Ophthalmic Technician).

22. Despite performing the job as a Ophthalmic Photographer well during a period of several months and complying will all of Defendant's application requests for such position, the Ophthalmic Photographer position was given to another candidate who, upon information and belief, required training and who did not have disabilities similar to Plaintiff's.

23. Plaintiff believes and therefore avers that Defendant failed to promote Plaintiff because of her disability and/or in retaliation for requesting reasonable accommodations.

24. Plaintiff also believes and therefore avers that Defendant failed to accommodate her disability and subjected her to a hostile work environment because of her disability and/or requests for a reasonable accommodation.

**COUNT I**
**Violations of the Americans with Disabilities Act ("ADA", as amended)**
**(Failure to Promote - Discrimination & Retaliation)**

25. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

26. Plaintiff properly exhausted her administrative remedies before proceeding in this Court for violations of the ADA by timely filing a Charge with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant Complaint within 90 days of receiving a notice of case closure and/or right-to-sue letter.

27. In or about April of 2014, Plaintiff applied for an open position within Defendant as a Ophthalmic Photographer, a position which she had already been training and performing in during the months preceding her application for such position.

28. Plaintiff had requested to be placed in the Ophthalmic Photographer position on multiple occasions as a reasonable accommodation for her aforementioned health conditions and also as a promotion.

29. Despite performing the job as a Ophthalmic Photographer well during a period of several months, Plaintiff was not hired into the Ophthalmic Photographer position.

30. Plaintiff was not promoted into the Ophthalmic Photographer position because of her (1) actual disabilities; (2) perceived disabilities; (3) due to her record of impairment; and/or (4) because she requested reasonable accommodations for her disability.

31. These actions as aforesaid constitute unlawful discrimination and retaliation under the ADA, as amended.

**COUNT II**
**Violations of the Americans with Disabilities Act ("ADA", as amended)**
**(Disability-Related Hostile Work Environment and Retaliatory Hostile Work Environment)**

32. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

33. Plaintiff properly exhausted her administrative remedies before proceeding in this Court for violations of the ADA by timely filing a Charge with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant Complaint within 90 days of receiving a notice of case closure and/or right-to-sue letter.

34. Since apprising Defendant of her aforementioned health conditions, limitations, and need for accommodations, Plaintiff has and continues to be subjected to a hostile work environment by way of discriminatory references about her health conditions, negative performance evaluations, and denial of upward mobility on multiple occasions.

35. These actions as aforesaid constitute unlawful discrimination under the ADA, as amended.

**COUNT III**
**Violations of the Americans with Disabilities Act ("ADA", as amended)**
**(Failure to Accommodate)**

36. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

37. Plaintiff properly exhausted her administrative remedies before proceeding in this Court for violations of the ADA by timely filing a Charge with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant Complaint within 90 days of receiving a notice of case closure and/or right-to-sue letter.

38. In or about April of 2014, Plaintiff applied for an available position within Defendant as a Ophthalmic Photographer, a position which she had already been training and performing in during the months preceding her application for such position.

39. Plaintiff had requested to be placed in the Ophthalmic Photographer position on multiple occasions as a reasonable accommodation for her aforementioned health conditions.

40. Defendant refused to accommodate Plaintiff and hired another candidate into the Ophthalmic Photographer position who required training unlike Plaintiff, as she had already been performing in the Ophthalmic Photographer position for several months prior to her application.

41. Thus, Defendant failed to accommodate Plaintiff under the ADA, as amended.

**COUNT IV**
**Violations of the Family & Medical Leave Act ("FMLA")**
**(Interference and Retaliation )**

42. The foregoing paragraphs are fully incorporated herein as though set forth at length.

43. Plaintiff was clearly an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(2)(a)(i)(ii).

44. Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve (12) months pursuant to the requirements of 29 U.S.C.A. § 2611(2)(i).

45. Further, Plaintiff had at least 1,250 hours of service with Defendant during the prior twelve (12) months.

46. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A. § 2611(4)(A)(i).

47. Plaintiff was entitled to leave, pursuant to 29 U.S.C.A. § 2612(a)(1) due to her own serious health conditions.

48. Defendant committed interference and retaliation violations of the FMLA by: (1) refusing/failing to promote Plaintiff for requesting and/or exercising her FMLA rights and/or for taking FMLA-qualifying leave; (2) by considering Plaintiffs FMLA leave needs in making the decision not promote her into the position of an Ophthalmic Photographer; (3) by subjecting her to a hostile work environment for exercising her FMLA rights and in an attempt to dissuade and prevent her from utilizing FMLA leave in the future.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, including the Americans with Disabilities Act, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be awarded liquidated damages, as permitted by applicable law, including the Family and Medical Leave Act, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering, as permitted by applicable law);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

F. Plaintiff is to be given a jury trial as demanded in the caption of the instant Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: ______________________

Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: February 2, 2015

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KIMBERLY WELLS<br>1501 Little Gloucester Rd. E23<br>Blackwood, NJ 08012<br><br>Plaintiff,<br><br>v.<br><br>RETINOVITREOUS ASSOCIATES, LTD.<br>d/b/a MID ATLANTIC RETINA<br>4060 Butler Pike<br>Plymouth Meeting, PA 19462<br><br>Defendant. | CIVIL ACTION<br><br>No.: 15-5675<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. This action has been initiated by Kimberly Wells (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against Retinovitreous Associates, Ltd. for violations of the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), the Americans with Disabilities Act ("ADA" -42 USC §§ 12101 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA" - 43 P.S. §§ 951 *et. seq.*). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's

state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

## PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. Plaintiff is an adult individual, with an address as set forth in the caption.

7. Defendant Retinovitreous Associates, Ltd. is a retina practice with locations in Pennsylvania, New Jersey and Delaware, including a location in Philadelphia, PA at which Plaintiff was employed.

8. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

9. Defendant has and continues to employ over 50 employees per calendar year for at least the last 5 years, and Defendant engages in a variety of business relationships generating revenue by engaging in the healthcare industry.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff worked for Defendant for a period of approximately four (4) years, from on or about August 8, 2011 until her termination on or about July 10, 2015.

12. At all times relevant herein, Plaintiff was employed with Defendant as an Ophthalmic Technician.

13. In or about January of 2013, Plaintiff was diagnosed with Multiple Sclerosis, which at times causes her to experience numbness in her hands, dizziness, fatigue, and pain.

14. Plaintiff's aforementioned health conditions, at times, limits her ability to perform some daily life activities, including but not limited to working, performing manual tasks, walking, stooping, bending, and lifting.

15. Despite her aforementioned health conditions and limitations, Plaintiff was able to perform the functions of her job well with Defendant; however, Plaintiff would at times require reasonable accommodations for her disability, including intermittent FMLA leave and changes and/or assistance in Plaintiff's job duties.

16. After being diagnosed with MS, Plaintiff apprised her management of her health conditions and aforementioned limitations.

17. In or about January 2015, Plaintiff was placed to work with doctors in Defendant's fellowship program as an alleged accommodation for her disability.

18. In February of 2015, Plaintiff filed a federal lawsuit against Defendant, asserting claims under the FMLA, ADA, and PHRA.

19. Prior to the filing of Plaintiff's federal lawsuit, she was subjected to minimal, if any, disciplinary action throughout the duration of her employment.

20. In months following the filing of her February 2015 suit, Plaintiff was subjected to hostility and animosity by Defendant's management, including but not limited to systematically being issued retaliatory and pretextual discipline.

21. On or about April 20, 2015, Plaintiff was suspended by Defendant for entirely pretextual reasons.

22. On or about July 10, 2015, Plaintiff was terminated by Defendant for an entirely pretextual reason.

23. Plaintiff worked for Defendant for about three (3) years with a nearly spotless disciplinary record, yet in the three (3) months following the filing of her federal lawsuit, she was peppered with pretextual discipline up until she was suspended and terminated.

24. Plaintiff was terminated (a) shortly after filing a federal lawsuit asserting her rights, (b) during which she experienced consistent and ongoing hostility in the form of pretextual discipline, (c) ultimately culminating in an entirely untrue and pretextual termination.

25. Plaintiff believes and therefore avers that Defendant suspended and terminated her in retaliation for the filing of her federal lawsuit and/or because of her disability.

## COUNT I
## Violations of the Americans with Disabilities Act ("ADA", as amended)
## (Wrongful discharge - Discrimination & Retaliation)

26. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

27. Following the filing of Plaintiff's February 2015 complaint containing claims under the ADA, Defendant retaliated against Plaintiff by systematically issuing her pretextual discipline, including a suspension and termination.

28. Plaintiff was also suspended and/or terminated by Defendant because of her disability.

29. These actions as aforesaid constitute unlawful discrimination and retaliation under the ADA, as amended.

**COUNT II**
**Violations of the Family & Medical Leave Act ("FMLA")**
**(Retaliation)**

30. The foregoing paragraphs are fully incorporated herein as though set forth at length.

31. Plaintiff was clearly an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(2)(a)(i)(ii).

32. Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve (12) months pursuant to the requirements of 29 U.S.C.A. § 2611(2)(i).

33. Further, Plaintiff had at least 1,250 hours of service with Defendant during the prior twelve (12) months.

34. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A. § 2611(4)(A)(i).

35. Plaintiff was entitled to leave, pursuant to 29 U.S.C.A. § 2612(a)(1) due to her own serious health conditions.

36. Following the filing of Plaintiff's February 2015 complaint containing claims under the FMLA, Defendant retaliated against Plaintiff by systematically issuing her pretextual discipline, including a suspension and termination.

37. These actions as aforesaid constitute unlawful retaliation under the FMLA.

**COUNT III**
**Violations of the Pennsylvania Human Relations Act ("PHRA")**
**(Wrongful discharge - Discrimination & Retaliation)**

38. The foregoing paragraphs are fully incorporated herein as though set forth at length.

39. Plaintiff re-asserts and re-alleges each and every allegation as set forth in Count I as they constitute identical violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, including the Americans with Disabilities Act, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C. Plaintiff is to be awarded liquidated damages, as permitted by applicable law, including the Family and Medical Leave Act, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous

conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering, as permitted by applicable law);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

F. Plaintiff is to be given a jury trial as demanded in the caption of the instant Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: *<u>/s/ Ari R. Karpf</u>*

Ari R. Karpf, Esq.
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: October 19, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2:15-cv-00478-JS

- - -

| | | |
|---|---|---|
| KIMBERLY WELLS, | : | DEPOSITION UNDER |
| | : | |
| Plaintiff, | : | ORAL EXAMINATION |
| | : | |
| - vs - | : | OF |
| | : | |
| RETINOVITREOUS ASSOCIATES, | : | KIMBERLY WELLS |
| LTD., d/b/a MID ATLANTIC | : | |
| RETINA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION, taken by and before JAMES HOPPER, a Registered Professional Reporter and Notary Public, at the law offices of WEBER, GALLAGHER, SIMPSON, STAPLETON, FIRES & NEWBY LLP, 2000 Market Street, Suite 1300, Philadelphia, Pennsylvania, on Friday, June 5, 2015, commencing at 10:03 a.m.

- - -

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, Pennsylvania 19103
(215) 564-1233

right, of 2013?

A. Yes.

Q. Had any manager, any former manager who may not be there anymore, but I'm talking about up until this point in April of 2013, or director ever discussed with you anything having to do with teamwork?

A. Not that I recall.

Q. How about did anybody ever dis -- any of the management ever discuss with you your attitude?

A. Yes.

Q. Okay. As of -- well, when was the first time, do you recall, having any discussion like that?

A. I don't remember. It's been discussed before.

Q. Do you remember if it's been discussed at all before you informed them of your diagnosis?

A. Yes.

Q. Can you recall for me who has discussed it with you and then the nature of what the discussions have been about attitude?

A. I cannot recall the nature of, you know, any discussions. Probably Rhonda, during

conversations, I've gone and talked to her plenty of times.

Q. How about anybody else besides Rhonda?

A. Not that I know of. Not that I recall.

Q. I understand that you don't specifically recall each of the discussions, but in general, what's been discussed with you about attitude?

A. There has never been anything really specific. It's just an attitude, so it's really never been anything specific.

Q. Okay. In terms of -- does it sound like what has been discussed with you involved having a positive attitude?

A. No.

Q. So a negative attitude?

A. Yes.

Q. In terms of coworkers, prior to January of 2013, had you ever had any, I'm going to use the term, "conflicts" with any coworkers? Meaning not any of the managers who you may report to, but with regard to any coworkers, have you had any conflicts before January of 2013?

A. Yes.

Q. And what has been the nature -- what was

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

\- - -

| | |
|---|---|
| KIMBERLY WELLS, Plaintiff | : CIVIL ACTION |
| -vs- | : |
| RETINOVITREOUS ASSOCIATES, LTD, Defendant | : |
| | : NO. 15-CV-00478 |

\- - - - - - - - - - - - - - - -

Oral Deposition of KIMBERLY WELLS, taken by and before John Landi, Jr., RPR, CCR, federally approved Registered Professional Reporter, New Jersey Certified Court Reporter and Notary Public, at the offices of Weber Gallagher, 2000 Market Street, 13th floor, Philadelphia, Pennsylvania 11903, on Monday, February 29, 2016, commencing at 10:12 a.m.

\- - -

ERSA Court Reporters
United Plaza - Suite 1520
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 564-1233

Q. Okay. And with regard to the op tech tasks that you perform at your new place of employment, are they generally the same or similar to the op tech duties and tasks that you had over time at Mid Atlantic?
A. Different.
Q. Okay. Could you describe for me the nature of your job duties as an op tech at the current place of employment?
A. Yes. So basically I just check vision and eye pressures, take down a patient's history, and that's basically it.
Q. The types of duties that you just described, they were the same type of duties, though, that you had performed at Mid Atlantic, correct?
A. Some of them, not all.
Q. Well, I mean you did do visions?
A. Right.
Q. Also reviewing and taking down history information on patients?
A. Okay.
Q. You did?
A. Yes.

sound familiar?
A. Yes.
Q. We went over this before, but just for purposes of us moving forward on the deposition today, we agree, Ms. Wells, that the job description two copies of which are marked Wells-2 was the job description you received and was in effect during your entire period of employment at Mid Atlantic, correct?
A. Correct.
Q. If you could go to the second page of the job description. If you go to P 103 actually for that second page. At the top there, and this is the second page that continues about duties and responsibilities that start on the prior page, correct?
A. Yes.
Q. Okay. And am I correct that in the list of duties and responsibilities that you see at the top of page 103 include setting up procedures, following practice policies?
A. Yes.
Q. And also ensure patient's fee ticket is filled out accurately and in a timely manner,

correct?
A. Yes.
Q. And although the second job description that starts at P 104 and goes to P 106 has some additional items under abilities, a section titled abilities that I am not going to refer to at the moment, can we agree if you look back at the first page of P 104, that the same duties and responsibilities are reflected there as you see on the other job description including set up procedures, following practice policies, and ensure patient's fee ticket is completed accurately and in a timely manner?
A. Yes.
Q. Do you see that?
A. Uh-huh.
Q. Do you recall undergoing any orientation and/or training at Mid Atlantic?
A. No.
Q. I mean from the point that you were starting back when you were hired, do you recall undergoing any orientation or training?
A. I mean basic training of how to set up injections.

Q. Okay.
A. That's about it.
Q. Could you describe for me what you recall the training involved about injections?
A. Just basically what medications to use and what each doctor likes on their tray, on their prep tray.
Q. Okay. And can you be more specific about what you mean?
A. What they like to use whether they use like a cotton tip or a speculum, just what their preference was when doing an injection.
Q. Okay. So when you said medications, you didn't mean the actual medications themselves, you mean the various methods or devices that each doctor may prefer for administering the medication?
A. Well, they would let us know what medication they would want to give to the patients and then we would get the medication and draw it up.
Q. Okay. And any other training that you can recall you received during your employment at Mid Atlantic?
A. No, not that I can recall.
Q. You understand that when I say that I also

refer to what may be on the job as you go along over time, different or various types of information, instructions, directives that you were given either verbally or in writing about performing your job?
A. Yeah, I learned a lot of things on the job such as, I mean, we had a new electronic medical records we had to learn. I learned surgical scheduling, photography.
Q. Anything else you can remember?
A. I guess billing and coding.
Q. Anything else?
A. No, that's about it that I can recall.
Q. And you had certainly work experience as an op tech before you even were hired at Mid Atlantic, correct?
A. Yes.
Q. Okay. Am I correct that at least at Mid Atlantic when you worked there under the -- I'm going to call it the umbrella of op techs, there are various types of op tech job duties such as, for example, visions, do you agree with me there?
A. Yes.
Q. OCT photographer; is that correct?
A. Yes.

remember.
Q. At or about the time it was implemented and subsequent thereto, were you provided with any instruction as to utilizing that system?
A. Um, there wasn't a formal training, but we just had basic -- like a basic one-on-one how you take medication out. There was never a formal training on the whole system.
Q. And can you recall -- can you describe for me what that one-on-one training was involving the Podus system?
A. I can't even recall if we ever had like a one-on-one training on how to use it. There was never any detail on how to use the system.
Q. But before February of 2015 am I correct that you had, in fact, received instruction on and had utilized the Podus system?
A. Yes.
Q. Okay. So can you describe for me what the Podus system was and what it was that you had been instructed on how to use it?
A. The Podus system was to keep track of the medications that were given to the patients and assigned to the patient and keep track of how long

drugs there were on hand in the office for billing purposes I guess.

Q. Okay. Am I correct that the Podus system is the software that generally manages the drug inventory --

A. Yes.

Q. -- at Mid Atlantic?

Am I correct there are, I'm going to utilize the term, alarms built into the system to make sure that a technician is pulling and assigning the correct medication, the correct dose, and for the correct eye of the patient?

A. Somewhat, yes.

Q. So you would agree with me on my description there?

A. Yes.

Q. And am I correct that the proper procedure for a technician who's pulling a medication for a patient, an op tech as you were, would be to go to a refrigerator, is that where the medication was kept?

A. Yes.

Q. And pull the drug?

A. Yes.

Q. And the medication had a bar code on it?

A. Yes.
Q. And am I correct that the proper procedure for the op tech was to go to the Podus system and scan that bar code from the medication to confirm that it's the correct medication, correct dosage for the correct patient that you're pulling it for?
A. Yes.
Q. And did you understand that this system among other things was to ensure that a patient was receiving the correct medication and the correct dose of that medication?
A. Um, yes. Well, it came in one dose, so...
Q. But you understood that -- I mean, one of the important aspects of this system was a patient's safety aspect?
A. Yes.
Q. You understood that?
A. Yes.
Q. And you also understood that certainly one of the aspects of this system involved the proper billing for the medication?
A. Yes.
Q. Okay. If a technician went to the Podus system and scanned a bar code from a medication that

was pulled and it didn't match or, in other words, it wasn't correct, then do you know what would happen, how the tech would be alerted that you didn't pull the proper medication?

A. Well, usually you would get a message if it wasn't pulled correctly or not correctly, but it would give you a message of whatever the problem was. It will let you know if this patient had medication, if it was there, if it wasn't there -- well, not if it wasn't there, but...

Q. And if it was correct it will give you a message. What would that message be?

A. If it was correct?

Q. If it was correct.

A. You would just proceed on. There wouldn't be no message. You would just proceed to assign the dose of the medication to the patient.

Q. Okay. So if it wasn't correct, there would be a message provided this is the incorrect medication or could be the incorrect dose or to the incorrect patient, but something would -- you would get a message alerting you to the fact that medication was not what should be administered to this patient?

A. Um, I guess if they were changing medications.

Q. Well, what would you look at -- you're going to see a patient. Okay. What would you look at first to tell you that you need to go pull a drug?

A. What would I need to --

Q. What information would you have --

A. I wouldn't pull a drug until the doctor requested that they are going to do an injection on the patient.

Q. Okay. And I'm talking about even before January, February of 2015, right? This was your experience?

A. Right.

Q. And would the next step immediately be to go to the refrigerator to pull the drug, right, after that?

A. Right.

Q. So what I'm asking then is how would you know what to pull?

A. Because the doctor would let you know what medication they wanted to use.

Q. So give me an example if you can.

Q. In the refrigerator?
A. Yes.
Q. Was there also any sort of difference between what's referred to a regular or speciality pharmacy drug?
A. Yes.
Q. What did that mean?
A. That meant that depending on the patient's insurance they would have to have their medication delivered to us. The person who is in charge of that would order their medication. And, you know, it would be delivered to us. So they would have a drug assigned to them. Instead of a general, it would be a drug assigned to the patient and not just, you know, them getting a general medication.
Q. Okay. So let's say, for example, the patient was to get -- is supposed to get a speciality versus the regular.
A. Right.
Q. And the op tech pulled the regular pharmacy version of it, if that op tech then followed the procedure and scanned it through Podus, Podus would catch it, catch the error?
A. Yes, I believe so.

interchangeably all of the time. So I'm not sure. I don't recall a message popping up if you change to a different medication because they change medication.

Q. So if I'm understanding you correctly, at least the one type of error that you're definitely sure Podus would catch if you scanned the drug would be pulling speciality versus regular or vice versa?

A. Yes.

Q. Okay. So prior to January of 2015, you had a clear understanding that whenever a drug was pulled from a refrigerator you had to run it through the Podus system and have that bar code scanned?

A. Yes.

Q. That was the proper policy and procedure at Mid Atlantic for op techs to follow?

A. Yes.

Q. Okay. You also mentioned that training that you recall receiving before February of 2015 involved what the Podus system was supposed to do in terms of billing. Could you describe for me what you mean by that?

A. I mean by that like -- I don't really know if it kept track of the billing part because we

with doctors who filled it out and decided, they decided what they wanted, but I guess we were supposed to check what medication the patient was being given, circle, you know, if the doctor said we are going to do Lucensis on the right side, circle what exactly is going to be done.

Q. So when we said under the written job description ensure patient's fee ticket is completed accurately and in a timely manner, are we talking about the same type of document?

A. Yes.

Q. Okay. So a fee ticket is the same as what you were calling a billing slip or a super bill?

A. Right.

Q. So one of the op tech's job responsibilities was to review this fee ticket --

A. Yes.

Q. -- for the patient?

A. Yes.

Q. Okay. And again, if you could describe for me what are the things you're supposed to make sure about it, how it was completed?

A. That the diagnosis was filled out on the back and if everything was filled out on the front,

but if a doctor fills it out, I'm not going to go double-check the doctor. I worked with doctors where they preferred to circle everything and fill everything out. I might double-check the medication that they want to give them and what I was doing, and that's it. I worked with a few doctors who filled out the billing slips, the fee slips themselves.

Q. That was one of the things I was trying to understand even before, you know, February of 2015 in your job duties as an op tech involving fee tickets, are you saying there were physicians who tended to fill them out or at least partially fill them out on their own?

A. Yes.

Q. And whether the physician filled it out or partially filled it out or not at all, it was still an op tech's job duty to make sure it was completed accurately, correct?

A. Well, yeah, I would double-check with the doctor and say is this what you want?

Q. If there was a doctor or doctors who didn't fill out any of it or didn't completely fill it, that's where you as an op tech would completely fill

it out or finish filling it out?
A. Yes.
Q. Okay. Okay. So prior to January of 2015 you were definitely familiar with these fee tickets or billing slips?
A. Yes.
Q. How about with regard to the fee billing slips prior to January of 2015 when you were involved in preparing them and/or checking them for accuracy, did you also have to check as to the drug or medication that was ordered by the physician and the type of coverage, insurance coverage that applied or didn't apply?
A. As an op tech if you were doing injections, yes.
Q. And certainly before January of 2015 you had done injections at Mid Atlantic?
A. At one time, yes.
Q. Yes. So if you were preparing injections as an op tech, the op tech's job responsibility included with regard to these fee billing slips whether there was insurance coverage for that particular type of injection?
A. Yes.

Q. Was it also the op tech's job responsibility who was involved in preparing patients for injection as to whether, and this is probably still somewhat of an insurance issue, whether pre-authorization or pre-certification was required?

A. Yes.

Q. So if you were -- and we will go back before January of 2015. As an op tech at Mid Atlantic when you were preparing patients for injection, and just so we're clear on the record here, you as an op tech didn't actually administer the injection?

A. No.

Q. You're preparing a patient for it?

A. Right.

Q. And am I correct that when you were doing that you would look at what is the medication that's been ordered for injection, right?

A. Uh-huh.

Q. Can you give me an example of the name of a medication that could be injected?

A. You could inject Eylea, E-Y-L-E-A.

Q. You would look at that particular

Q. Okay. And would that form also tell you whether a pre-certification or authorization was needed or not needed?
A. Or not needed, I don't know, I can't remember, I don't think they ever did pre-authorizations or pre-certifications on there.
Q. Was there somewhere else then you should be looking?
A. There was a billing grid they had, but that was usually -- yeah, they had billing grids for the medication.
Q. So I just want to make sure I have the documents straight. The fee ticket is the one that you needed to make sure was accurate and would tell you about insurance coverage?
A. Yes.
Q. And then there's an insurance grid?
A. Yes.
Q. An insurance grid or chart and that grid or chart would tell you if that particular medication to be administered or that procedure requires pre-certification?
A. Correct.
Q. Okay. So the fee ticket then would tell

you who the insurance company was?
A. Yes.
Q. All right. Could you give me an example of, just give me an name of an insurance company you came across at Mid Atlantic?
A. Aetna.
Q. Let's say it was Aetna. You would then go to that insurance grid and you would be able to find Aetna on there?
A. Yes.
Q. And on that grid it would tell you whether Aetna required a pre-cert or not?
A. Yes.
Q. For that procedure or medication that you're now checking on?
A. Yes.
Q. If the patient was a new patient, so came in for an initial evaluation.
A. Uh-huh.
Q. And after seeing the physician, am I correct there may be times when you worked at Mid Atlantic where the physician then ordered right then for this patient to have an injection, be prepared for an injection?

call, but for other medications you would have to call speciality billing or to get approval or confirmation, whatever.

Q. If you didn't see information on the fee ticket indicating that the medication that you're preparing for injection for this patient was covered to any extent, then am I correct you knew that you should not go forward and prepare that patient for administration of that medication until you ascertained the coverage?

A. Correct.

Q. Okay. And to ascertain that you would -- you're saying you understood you should be contacting billing speciality personnel?

A. Yes.

Q. Were they on site?

A. No.

Q. Regardless of what speciality billing will tell you about the coverage, am I correct that you would still, though, at least be able to tell whether that particular insurance company requires a pre-cert by looking at the grid?

A. I mean, you can look at the grid, but if they needed a pre-cert.

Q. That's what I mean. The grid would tell you if they needed a pre-cert, right?
A. It would tell you. Yeah, it would tell you.
Q. In the time period that you worked at Mid Atlantic, would you agree with me that over a period of a few years that what insurance companies may or may not require or approve or don't approve can change, doesn't stay the same?
A. Right.
Q. In other words, if you looked at the chart for Aetna in 2011, you shouldn't rely on that, you shouldn't rely on what you remember reading there about Aetna, three years later you could be checking the grid because it could have changed?
A. Correct.
MR. WALSH: Off the record.
\- - -
(Whereupon, there was a luncheon recess.)
\- - -
BY MS. WALSH:
Q. Okay. So just following up on the area of questioning that we were on, it was one of your job responsibilities as an op tech to make sure that a

drug ordered by a physician was covered or that there was coverage, make sure there was insurance coverage, correct?

A. Yes.

Q. And also as an op tech one of your job responsibilities was to go over whether pre-authorization or certification was required by the particular insurance company, correct?

A. Yes.

Q. If a medication injection was performed and the insurance company required pre-certification or pre-authorization but that information wasn't checked and, therefore, it wasn't confirmed, you know, that that particular insurance company required pre-certification and then this medication ended up being administered without that pre-certification, did you understand what could happen with regard to billing and payment as a result of that occurring?

A. Um, no, never been in that situation or was never brought to my attention before.

Q. Did you understand that if an insurance company required pre-certification for the procedure, that the consequences of not having the

Bates stamped MAR 0037 through MAR 0040. And as we discussed earlier in your prior sworn testimony you acknowledge receiving the employee handbook from Mid Atlantic, correct?

A. Yes.

Q. Okay. And this portion that we marked here from the handbook, at least the first heading on the first page is office etiquette and guide to good conduct in our workplace is the next heading. And towards the bottom is corrective disciplinary action. Do you see where I read those headings?

A. Yes.

Q. When you were employed at Mid Atlantic you understood that as set forth in the office etiquette section of the handbook that Mid Atlantic had established guidelines for office etiquette and that these principles of interaction help ensure that all employees and patients are given consideration, and there's a list there. And am I correct that the fourth item listed there is to provide service excellence through unfailing attention to consistency and detail?

A. Yes.

Q. And you understood that these were

guidelines established by Mid Atlantic for all employees including yourself as an op tech to follow?

A. Yes.

Q. Towards the bottom of the first page titled corrective disciplinary action am I correct that you understood through the course of your employment at Mid Atlantic that it was the responsibility of each employee including yourself to comply with practice policies and procedures and to perform your job duties satisfactorily?

A. Yes.

Q. And am I correct that you understood that violations of proper workplace and conduct guidelines including instances of unacceptable behavior or misconduct, attendance and punctuality and poor work performance were subject to corrective disciplinary action at Mid Atlantic?

A. Yes.

Q. And you understood that Mid Atlantic management would determine the extent of the disciplinary action depending on the seriousness and frequency of the violation?

A. Yes.

Q. While employed at Mid Atlantic, did you understand as set forth at the top of page 38 of the employee handbook that if your work performance was considered unsatisfactory or unacceptable, that a supervisor would make reasonable efforts to discuss and document the deficient performance and attempt to help you improve?

A. That's what it says.

Q. And am I correct that the guidelines as set forth under the corrective disciplinary action portion of the employee handbook stated that repeated violations, multiple violations of work rules or guidelines and/or continued poor performance may result in termination of employment? Did I read that correctly?

A. Yes.

Q. And you understood these were the guidelines at Mid Atlantic while you worked there?

A. Yes.

Q. And further down in bold you understood that instances of unacceptable behavior related to safety, attendance, punctuality, time keeping, performance, behavior and conduct may result in disciplinary action up to and including termination

of employment?
A. Yes.
Q. And am I correct that the handbook provides examples of such conduct which includes but are not limited to the following, and the first item listed there is unsatisfactory work performance? You understood that as well?
A. Yes.
Q. On the same page on page 38 above the bold statements there, did you understand that Mid Atlantic reserved the right to take one or more corrective disciplinary actions in addressing job performance deficiencies or violations of practice policies and procedures and the one or more corrective disciplinary actions that it reserved its right to take including verbal counseling, written warning, suspension with or without pay, demotion, transfer or termination of employment? Did you understand that as well during your employment?
A. Yes.
Q. Prior to February of 2015, you had received two disciplinary warnings during the course of your employment at Mid Atlantic, correct?
A. Correct.

time of FMLA leave?
A. Yes.
Q. Before you took the period of leave beginning in October of 2014, am I correct that after you had submitted that initial certification in February of 2013, that you were granted intermittent FMLA leave by Mid Atlantic?
A. Yes.
(E-mails were marked Wells-6 for identification.)
BY MS. WALSH:
Q. Okay. The package of documents marked as Wells-6, am I correct that this starts with an E-mail from Ms. Bednar, who is the director of human resources, to you on November 22, 2014 with information and paperwork associated with FMLA leave as a result of your submitting the doctor's note that we marked as Wells-5?
A. Yes.
Q. If you flip through to the third page the series of E-mails after the October 22, E-mail, am I correct it includes you E-mailing Ms. Bednar while you were out on the FMLA leave about applying for a research coordinator position?

Q. And so as of the time you went out for FMLA leave in October of 2014, am I correct that you had performed up until that point in time over time the various types of duties that we discussed such as visions, OCT photography, service, scribing?

A. Yes, probably everything except for service. They had someone in that position.

Q. Well, before October of 2014, had you not spent any time in service?

A. I spent sometime.

Q. That's what I thought. I mean, you had spent time in service?

A. Yes.

Q. And the service again was with the fellows?

A. Yes.

Q. Okay. As of the time that you went out for FMLA in October of 2014, was there any particular op tech or op techs who on a regular basis were working in service?

A. Yes.

Q. And who was that?

A. That's Kristen Camacho.

Q. And on the occasions that you had worked in service before October of 2014, were they occasions

A. Probably, I don't remember. I think we all rotated while she was out.

Q. Okay. So do you think perhaps it would have been, you know, in the fall to the end of 2014, somewhere in that time period she must have been on maternity leave?

A. Probably.

Q. Okay. And what was the nature of tasks that you would perform when you were rotating through service?

A. We would just room the patients for the doctor.

Q. Did you say room?

A. Room, get the patients, bring them into the rooms for the doctors, help them set up any procedures that they needed to perform on the patients.

Q. Whether it was the regular rotation of going through service or when you were rotating through while Ms. Camacho was on maternity leave, did you like working in service?

A. Yeah.

Q. Anything in particular that you liked about it or just an overall you liked it?

medical certification from Dr. Berone that his office dated October 31, 2014?
A. Yes.
Q. And this return to work fitness for duty was submitted to Mid Atlantic in order for to you return to work after the FMLA leave, correct?
A. Yes.
Q. And am I correct that Dr. Berone released you to return to work effective November 3, 2014?
A. Yes.
Q. And you did return to work on a full-time basis, correct?
A. Correct.
Q. And am I correct that in the comments section the form from Dr. Berone it states patient is diagnosed with MS and the restrictions are periodic, correct?
A. Yes.
Q. And in the list of restrictions am I correct that it states patient is unable to sit, stand or walk for long periods, she will need periodic breaks throughout a work shift, she may experience vertigo, fatigue and weakness, may be unable to climb, stoop, bend or lift? Did I read

that correctly?
A. Yes.
Q. And is there anything listed on this return to work fitness for duty that mentions memory loss or forgetfulness?
A. No.
Q. So when you returned to work on or about November 3 of 2014, did you return on the floor as an op tech?
A. I did. I don't know if I was scribing with the doctor, I don't remember if I was full time scribing with doctors. I think I was just scribing with Dr. Regillo at that time.
Q. Every day?
A. Only on Mondays.
Q. Oh, on Mondays?
A. Uh-huh.
Q. And the rest of the week?
A. I was in photography.
Q. And when you came back, were you also still doing the rotation we talked about in service?
A. Yes, probably.
Q. Do you recall if Ms. Camacho was on leave as of the time you came back or shortly after you

came back?
A. I don't remember.
Q. Before you went out on leave in October of 2014, had you been scribing for Dr. Regillo on Mondays?
A. Yes.
Q. And was scribing for Dr. Regillo on Mondays an op tech a task that you wanted to do?
A. Yes, I was asked to do it.
Q. Okay. Well, did you like to do it with Dr. Regillo?
A. Yes.
Q. So to the best of your recollection when you returned in November of 2014 you were scribing for Dr. Regillo on Mondays which is what you were doing before your leave?
A. Yes.
Q. You were also performing on CT photography tasks which was something you were doing before you went on leave as well?
A. Yes.
Q. And to the best of your recollection, do you believe that you were also doing any sort of the rotation through service which is also something you

had also done before you went out on FMLA?

A. Probably.

(E-mail was marked Wells-10 for identification.)

BY MS. WALSH:

Q. The document marked as Wells-10 is an E-mail from you to Michele Bednar and copied to Edward Weber on November 19, 2014, correct?

A. Yes.

Q. And Mr. Weber was director of operations at the Wills practice site?

A. Yes.

Q. And in this E-mail you stated that you wanted to give an idea of other duties I can do in the office, duties such as disability paperwork, assist our surgical scheduler, call back, order speciality meds, these are just a few. Did I read that correctly?

A. Yes.

Q. Do you know how it came about that you sent this E-mail to Ms. Bednar and Mr. Weber about your ideas of duties that you could do in the office?

A. I think we were talking about a different schedule for accommodation for me.

Q. As a result of your return from FMLA leave?
A. Yes.
Q. So when you represented that you could do the types of things that you listed here, when you made reference to surgical scheduler, for example, was there one particular person who did surgical scheduling?
A. Yes.
Q. Before?
A. Yes.
Q. Who was that?
A. Donna Gambino.
Q. And with regard to ordering speciality meds, was there only one person who was responsible for doing that before?
A. Yes.
Q. And who was that?
A. Christine Lalov.
Q. And the individuals you listed were op techs?
A. Christine Lalov was.
Q. And when you provided this list you said these are just a few. Were you saying that these are things that you could assist with that other

people, at least one of which wasn't an op tech, were already doing?

A. Yes.

Q. At some point after the November 19, 2014 E-mail, did you have a discussion, whether it was in a meeting or otherwise, with Ms. Bednar or Mr. Weber or both?

A. Probably.

Q. Do you recall whether the meeting or discussion took place by or before the end of the year?

A. Probably before the end of the year most likely.

Q. Do you remember if you met with anyone else other than Shelly and Ed?

A. In regards to this?

Q. Yes.

A. I don't think so. I don't think Kristen was in any of the meetings.

(Two E-mails were marked Wells-11 for identification.)

BY MS. WALSH:

Q. If you can refer first to the second page of Wells-11 which is Bates stamped P 27. Am I

correct this is an E-mail you sent to Mr. Weber on January 2, 2015 regarding backup for surgical scheduling?

A. Yes.

Q. And am I correct that you inquired who was Donna Gambino's backup in the office for surgery scheduling when she is out. I know sometimes Christina jumps in. Which Christina were you referring to?

A. Her last name is Rodriguez.

Q. And I know I am asked to help, so I just wanted to know if this is something I should continue to help, which I would love to, or let Christina handle, did I read that correctly?

A. Yes.

Q. At least prior to January of 2015, you had been asked to help and did with regard to surgery scheduling which is something that you said was a task that you could perform?

A. Yes.

Q. And am I correct that Mr. Weber responded to you on the same day stating I think it would be great if we relied on you for scheduling. Let's talk later this morning. I am expecting to hear

back from Shelly today so we can begin your new schedule. Did I read that correctly?
A. Yes.
Q. And are we still in that time frame after you return from leave and duties that you represented that you could perform and making those arrangements?
A. Yes.
Q. So surgery scheduling was a job position that was being filled by a non-op tech?
A. Yes.
Q. Was there any particular area of the actual practice location where surgical scheduling took place?
A. Yes.
Q. Where was that?
A. More towards the front of the office. She had her own office.
Q. Is there anything that you can recall that was discussed at the meeting that took place with you and Mr. Weber and Ms. Bednar at or about the end of the year of 2014?
A. Um, I think we just basically discussed me not being on the floor so much and having other

duties to perform that I wouldn't be on the floor as much and doing different things.

MS. WALSH: Off the record for a moment, please.

\- - -

(Whereupon, there was a brief recess.)

\- - -

(Schedule was marked Wells-12 for identification.)

BY MS. WALSH:

Q. The document marked as Wells-12, did you ever see this document?

A. Yes.

Q. Am I correct that at the meeting that you had at the end of the year in 2014 the discussion that took place about the job duties that you represented you could perform and arrangements that Mid Atlantic was working on making with you eventually led to this proposed schedule for you?

A. Yes.

Q. And did you proceed to perform work consistent with this proposed schedule?

A. Um, somewhat, yes.

Q. And was that in the beginning of 2015?

A. This schedule?
Q. Yes.
A. I don't know if it was in the beginning. We might have still been in the December time.
Q. Okay. So late, it could have been starting December 2014 and then did you continue in January of 2015?
A. Probably. It was a short time frame, so I don't really remember.
Q. Why was it a short time frame?
A. We tried the schedule, but it just wasn't flowing right, so we had to revamp.
Q. Okay. And in terms of what you described as revamping, what happened then?
A. I don't remember. I think I talked to Ed about it and talked to him about the schedule not flowing right, we are going to come up with other ways and options to see how the day could go. And then --
Q. Sorry, I didn't mean to cut you off.
A. No, that's okay.
Q. When you talked to Mr. Weber about other options, was anybody else present when you had that meeting?

A. I don't think so. I think I just talked to him directly and then I think he sent Shelly an E-mail or something.
Q. Was there anything in particular that you suggested or proposed in regards to those options?
A. Not that I remember.
Q. Is there anything you remember of what Mr. Weber said in terms of options?
A. I don't remember. I think we were just trying to work it out and come up with a different flow. I don't remember exactly everything that took place and what was said.
Q. So as far as any particularized request or option, you don't recall that you made a particular one?
A. No.
Q. Do you recall whether either at or any time after that meeting with Mr. Weber making any representation to him or anyone else at Mid Atlantic that you liked working in service?
A. Not that I recall. That was never discussed as an option.
Q. Service was never discussed?
A. At that time.

Q. Well, I'm asking if thereafter, after the meeting you had with Mr. Weber.
A. He did approach me about it, yes.
Q. And am I correct that the discussion you had with Mr. Weber about service took place before you filed the February 2015 lawsuit?
A. Yes.
Q. And what can you tell me about what you recall about the discussion you had with Mr. Weber about service?
A. Well, I think it took place in the hallway. He just kind of made a suggestion about me going into service and he thought it would be a good idea for me to work in service and that I could help the fellows and help the new fellows that would be coming in, help them prepare.
Q. And as we discussed, you had rotated through service before?
A. Yes.
Q. So do you know what was going on with Ms. Camacho at that time who you indicated, I thought you said she was what you referred to as the permanent person in service?
A. Well, she was there. I don't know if she

was permanent, but she was in that position I think since, I don't know, maybe when she let it be known she was pregnant they put her in that position.

Q. So did you understand whether that was a position that she was going to continue to be in after she returned from leave?

A. I don't know.

Q. Okay.

A. I wasn't given that information.

Q. And what was your response to Mr. Weber about working in service on more than a rotational basis I assume, correct?

A. Yes. You know, I thought it was a good idea.

Q. Now, as of the time that you had this discussion with Mr. Weber, can we agree it must have been, you know, in the time frame of December 2014 and/or January of 2015?

A. Probably, yes.

Q. As of the point in time that you were having this discussion with him about service, were you still scribing for Dr. Regillo on Mondays?

A. Yes.

Q. And did you want to continue to scribe for

Dr. Regillo on Mondays?
A. I didn't have a problem with it. I did stop for a period of time, though.
Q. In 2015 or before then?
A. Once I was in service, I did stop.
Q. You did stop?
A. Yes.
Q. So I take it you agreed that service was an area that you wanted to work in and you then went into service was it five days a week then?
A. Yes.
Q. And that started in January of 2015?
A. I don't recall exactly when, probably sometime around then.
Q. So once you were in service every day of the week in January of 2015, you didn't scribe for Dr. Regillo at all anymore?
A. For a period of a couple of weeks or so I did not, but I was requested to go back to scribing with him on Mondays.
Q. And who made that request?
A. Kristen Winklespec asked me if I could come back and scribe for him.
Q. Do you know if Dr. Regillo made any sort of

request about you returning to work for him scribing one day a week?
A. Not that I know of.
Q. Okay. Did you have any objection to scribing for Dr. Regillo for one day a week while you worked in service the other days of the week?
A. No.
Q. Okay. From that point then forward through the time of your separation from Mid Atlantic, did you then work Mondays scribing for Dr. Regillo and then the rest of the week in service?
A. Yes.
Q. Once you were working in service, am I correct that Kristen Winklespec was still the clinical manager of that location?
A. Yes.
Q. And Mr. Weber was the director of operations for that location?
A. Yes.
Q. And there were how many fellows in the service?
A. Three.
Q. And who were they, if you remember?
A. Dr. Hong, Dr. Sridhar and Dr. Kahn.

through service.
A. Uh-huh.
Q. And the job tasks once you're in it on that more permanent basis starting in January of 2015. When you did rotate through service, did you participate in performing drug counts?
A. No.
Q. And did you do that when you were in service beginning in January of 2015?
A. Yes.
Q. You said that you were responsible for when you were in rotation in service to bring patients to the exam room --
A. Yes.
Q. -- for the doctor?
And you would take information such as?
A. I wouldn't take any information.
Q. Did you review any information with the patient?
A. No, except what their name was, confirming who they were.
Q. Anything else?
A. Nope.
Q. And prepare the patients for procedures

that the fellows were going to perform?
A. Yes.
Q. And what types of preparations were they?
A. If they were getting an injection, just prepping their eye, giving them numbing drops and giving them the information for the doctor or if they were having a laser, I would take the patient to the laser room and set them up for a laser treatment.
Q. When an op tech is working in service, was that type of preparation the type of work that an op tech would do even before you were in there in January of 2015?
A. Yes.
Q. Okay. Did working in service also include making call backs?
A. Yes.
Q. Anything else that we haven't discussed in terms of the tasks involved with working in service as an op tech?
A. Nope.
Q. Prior to you being in service on a regular basis in January of 2015, when you talked about after that Podus system had been put in place, am I

(E-mails were marked Wells-13 for identification.)

MS. WALSH: Although it is not attached to this record I'm just confirming we do have a confidentiality stipulation in order in this case. This particular document marked as Wells-13 was produced by the plaintiff. It's Bates stamped P 85 through P 86. And the subject line has the name of a patient which needs to be kept confidential on the record.

BY MS. WALSH:

Q. Ms. Wells, am I correct that an incident took place on February 25, 2015 involving a patient who I'll go by the initials as CB and a medication known as Avastin?

A. Yes.

Q. And what, if anything, led you to send this E-mail on February 25, 2015 at 11:36 a.m. to Mr. Weber, Ms. Winklespec, Candice Leonardo, and copied to Shelly Bednar?

A. Because there was a misunderstanding between me and Christine about how to handle a certain situation with this patient and she got

really upset about it.

Q. Who got really upset?

A. Christine Lalov.

Q. What happened?

A. Basically she was in charge of speciality drugs. So as always, whenever there was a question about speciality drugs, we would go to Christine and ask her about, you know, what should we do if the patient's medication is here because she kept a log of every patient speciality drug. And I think we just had a conversation and I don't know if I misunderstood her or she misunderstood me, but she was just quick, like dismissive in telling me whatever it was to do about the situation with this patient, so...

Q. Okay. Well, when this patient was seen on February 25, 2015, was she a new patient?

A. I don't think so, no.

Q. And what information did you have that this patient was to receive a -- was a speciality patient?

A. I wasn't sure. Sometimes they would put at the top of the fee slip it was a speciality pharmacy or if I just knew by the insurance that she was

speciality. I don't remember what the circumstance was or why I knew she was speciality, but I knew she was speciality.

Q. But you knew she was?

A. Yes.

Q. Okay. And prior to this particular patient on this day, had you pulled -- let me change that.

Prior to this day with this patient, had you seen a speciality patient in service?

A. Probably.

Q. So by knowing that this particular patient was a speciality patient, what were you going to be doing, pulling that speciality drug?

A. Yes. So I think when I went to the refrigerator, that I did not see her medication in the speciality refrigerator, which would be the pharmacy refrigerator.

Q. Was there only one speciality pharmacy refrigerator?

A. There was, but in service I think Christine put like service speciality in one refrigerator, but there was a separate refrigerator, so I couldn't find her medication anywhere.

Q. And I'm sorry, where did you look?

A. I don't remember. I think I looked in the service refrigerator -- no, I think I looked in both refrigerators and I didn't see her medication anywhere.

Q. What were the two refrigerators you looked in?

A. There is one in service and one -- I don't know. I don't know the number. They have them numbered, the refrigerators, and then there is another refrigerator that has pharmacy meds in there.

Q. Okay. So you believe you looked in at least one, if not another one or two refrigerators, is that your testimony?

A. I believe so, yes.

Q. And you were unable to locate the speciality drug for this patient?

A. Yes.

Q. Am I correct that you -- and this medication was Avastin, correct?

A. Yes.

Q. Am I correct that you pulled medication from Mid Atlantic's regular pharmacy stock for this patient?

A. I don't even recall what happened.

Q. Okay. Do you recall that you pulled a medication and that you did not scan the bar code on Podus?

A. Again, I don't recall what happened.

Q. Okay. So you don't recall where you pulled the drug from and you don't recall that you didn't scan it, am I understanding you correctly?

A. I really don't recall the whole situation, exactly what happened with this patient.

Q. If you could refer to the document we marked as Wells-13.

A. Uh-huh.

Q. I'm just reading your E-mail. I just want to clarify what happened with patient CB being given Avastin from MAR's stock, as she is a speciality patient. Did I read that correctly with the exception of the initials instead of the full name of the patient?

A. Yes.

Q. So does this refresh your recollection that you were aware that this patient was a speciality patient but gave the patient non-speciality medication?

A. I mean, that's what it says, but I still don't really remember in my mind what happened. Although I wrote this, I don't really remember the exact everything.

Q. Putting aside again for a moment this particular patient that day, as we discussed earlier, am I correct that regardless of whether it was a speciality or non-speciality patient and drug, when a drug is pulled, the proper procedure for the op tech to follow is to scan the bar code through Podus?

A. Yes.

Q. And sitting here today, you don't recall scanning this particular medication that you did pull from the regular stock?

A. I don't remember doing that.

Q. Okay. If an op tech pulled a regular pharmacy drug for a speciality patient and the op tech scanned the bar code as he or she was supposed to do as we discussed earlier, the Podus system would provide an error message because it was the wrong medication, correct?

A. Probably, yes.

Q. Now, when you could not, as you said,

locate the medication, the speciality medication, did you address it with the clinical manager Kristen?

A. No.

(Verbal written warning was marked Wells-14 for identification.)

BY MS. WALSH:

Q. The document that's been marked as Wells-14, am I correct that this is a verbal written warning that was issued to you that you signed on March 2, 2015 with the date of infraction being February 25, 2015?

A. Yes.

Q. And that the infraction described was preparation of patient for injection and securing drug without taking drug out of the Podus system, the patient was a speciality pharmacy patient, correct?

A. Correct.

Q. And am I correct that the second page after your signature there, if you could go to the second page, please, that it's your handwriting that states I understand the drug should have been removed first out of Podus and it was a mistake on my end; is that

correct?
A. Uh-huh.
Q. Am I correct that regardless of I believe what you referred to as some misunderstanding between you and Christine Lalov, that regardless of your description of that, you did not follow proper procedure by pulling a drug and not checking it through Podus before it was being supplied to the patient?
A. Yes.
Q. And in addition this was a speciality pharmacy patient who received a non-pharmacy speciality drug as a result of your not following the proper procedure by checking it through Podus?
A. Okay.
Q. Correct?
A. Correct.
Q. And we have agreed you didn't communicate with the clinical manager who was your immediate supervisor at Mid Atlantic, correct?
A. Correct.
Q. Ms. Wells, do you know whether any other op techs at Mid Atlantic Wills practice location had ever been issued any warnings for providing a

medication to a patient that was not the specific medication that was supposed to be given?
A. Not to my knowledge.
Q. That doesn't mean it didn't happen, correct?
A. Correct.
Q. Would you agree that by not checking this medication through the Podus system per policy that the patient safety mechanism which is built into the system was bypassed by you?
A. No.
Q. If an op tech does not scan the bar code of a medication that's pulled, then how is it that the medication was checked through the system to determine that it was the correct medication, correct dose for the correct patient for the correct eye?
A. Well, just like you have to look at -- confirm the medication before you put it in the patient's eye, so there are other mechanisms in place. I don't know the patient's safety was compromised.
Q. I didn't specifically ask you whether you believed it was compromised or not, but by bypassing

the system you have bypassed a safety mechanism for which at least in part the system is set up for, correct?

A. No.

Q. Well, earlier you agreed that one of the aspects of the Podus system was patient safety, correct?

A. I guess.

Q. We talked about it for being for patient safety as well as with respect to billing purposes you said, do you remember that?

A. Billing purposes, yes.

Q. With regard to the billing aspect of the situation, if the medication is not scanned as it should be through Podus there could be a loss of revenue associated with an incorrect medication that wasn't the medication that the patient was supposed to receive, correct?

A. Probably.

Q. By the way, on the document marked as Wells-14, am I correct that the form represents steps that are consistent with the steps that can be followed that we discussed in the employee handbook, verbal warning, verbal written warning, special

written warning, and termination?
A. Yes.
Q. And the first one that we talked about here that was marked as Wells-14 was a verbal written warning?
A. Yes.
Q. Okay. After the verbal written warning that was issued on March 2 of 2015, am I correct that there was a situation that occurred where you had a patient that presented who needed a speciality Avastin injection and you were unable to locate the drug in the refrigerator?
A. For this situation?
Q. Another situation that occurred after.
A. Probably.
Q. Do you remember what you did in that situation?
A. I think I let the doctor know who was the fellow working that we didn't have the patient's medication.
Q. Did you do anything else other than advising the fellow that you were unable to locate the medication?
A. No.

Q. Did you communicate with the clinical manager Kristen?

A. No, that was never a procedure to do that to my knowledge.

Q. Was it necessary to have that procedure in writing?

A. Yes.

Q. In your view it was?

A. Yes.

Q. So did you proceed to discharge the patient?

A. I didn't discharge the patient, the doctor advised me that I could discharge the patient.

Q. And then you discharged the patient?

A. And then I told them we would have to reschedule.

Q. Well, you said that you notified the physician. I take it you don't recall which one it was?

A. No.

Q. That you weren't able to locate the medication?

A. Correct.

Q. So what I want to know did you communicate,

though, with anyone about why it couldn't be located or, you know, is there some other way we could try to figure out why this medication can't be found when this patient had come in for this speciality injection?

A. No, it was never a procedure to do that.

Q. In the earlier situation that we talked about with regard to the patient named CB you said you talked to Ms. Lalov at some point during that situation?

A. Yes.

Q. Was there a written policy that directed you to talk to Ms. Lalov?

A. No.

Q. But you spoke to her anyway?

A. We all did. She was in charge of speciality pharmacy drugs, so everyone went to her if they had problems.

Q. There was nothing that prevented you from talking to anyone other than notifying the doctor with this patient who you couldn't find the Avastin medication for that you discharged, right?

A. No, not that I know of.

Q. So am I correct that by discharging the

fee.
Q. But you don't recall if that conversation took place between you and the doctor?
A. I don't recall it. It may have. It probably did.
Q. When an injection is delivered to a patient am I correct that that information is supposed to be documented on the fee ticket?
A. Yes.
Q. And obviously one reason would be to confirm a patient received a form of treatment, correct?
A. Correct.
Q. Is there any other reason it should be documented?
A. For billing purposes.
Q. For billing. So again, in terms of your job duties as an op tech, your job duties included to confirm that information was complete and accurate on the fee ticket?
A. On paper, yes.
Q. And when you say on paper you mean written job description that we have marked, correct?
A. You marked, yes.

(Written warning was marked Wells-15 for identification.)

BY MS. WALSH:

Q. The document marked as Wells-15 am I correct that this is the written warning that was issued to you that you signed on March 20th of 2015 with regard to three infractions that are listed here?

A. Yes.

Q. And the first infraction is the one that occurred on March 3rd of 2015 that is described as a failure to meet reasonable expectations of work performance. And this refers to the situation that we discussed where you discharged the patient and rescheduled her for another day to return because you didn't see the speciality Avastin medication in the refrigerator?

A. Yes.

Q. And the warning on the first paragraph there regarding the March 3, 2015 infraction states that you did not attempt to speak with your manager Kristen. That is accurate, correct, you did not attempt to speak with Kristen?

A. No.

Q. And am I correct that it states if you had spoken with the manager, Kristen could have confirmed that the drug was on hand. In addition, she could have authorized the use of a sample of Avastin or Eylea if appropriate?
A. Okay.
Q. So by not even attempting to speak to your manager you discharged a patient when, in fact, Kristen your manager could have confirmed the drug was on hand and in addition could have authorized the use of a sample if appropriate; is that right?
A. I guess.
Q. And this warning also covered two infractions that occurred in addition to March 3rd which was on March 12th and March 17th wherein a total of three injections were delivered without being documented on a fee slip; is that correct?
A. I guess I never seen that documentation that it wasn't, that those were not coded.
Q. You've seen fee slips, correct --
A. I've seen fee slips.
Q. -- in your life?
Did you have an understanding as to what process Mid Atlantic went through at this location

for purposes of reviewing fee slips?
A. What do you mean?
Q. After, you know, after fee slips were turned in.
A. I guess they went to the billing.
Q. So it was your understanding that fee billing slips were reviewed?
A. By billing.
Q. And if there were any errors in fee slips or at least that's one of the things that would be picked up by the reviewer?
A. Yes.
Q. Okay. And so it was your understanding that fee slips were reviewed for everybody --
A. Yes.
Q. -- that worked there, not just for yours?
A. Yes, everyone.
Q. Do you know whether any other op techs had ever been -- at this particular Mid Atlantic location had been discovered to have not correctly coded or, you know, accurately reviewed the fee slip and was issued any disciplinary action as a result?
A. There were frequent mistakes on the fee slips, but I don't know if anyone was ever

disciplined for them.
Q. You did sign the warning that was issued on March 20, 2015, right?
A. Yes.
Q. Okay. And is that your comment written there, per management there is no written policy to tell manager?
A. Correct.
Q. And is what you wrote there per management there is no written policy to tell manager the same as your testimony here today that you did not communicate with the manager Kristen because there was no written policy to communicate with her?
A. No, that's not it. I think we had a conversation during this write-up about -- I don't recall the whole what was said in the meeting, but I think I wrote that because it came up in a discussion during this meeting of me being written up.
Q. I'm sorry, what do you mean that per management there was no writing policy to tell a manager? What did you mean when you wrote that?
A. Well, I think in the conversation, I don't recall exactly what was said and why it came up, but

I think it was brought up or Kristen may have said why didn't you come to me? Or I don't even remember why it came up, but it came up that there is not a written policy to tell her anything about or come to her when there was an issue.

Q. Okay --

A. Because I think I said I never had to do that before, never done that before.

Q. Well, had you ever discharged a patient after being unable to locate the speciality medication without discussing it with anyone else?

A. No, I discuss it with the doctor.

Q. Had that occurred at all in the past?

A. Yes.

Q. When you were in service?

A. Not only in service, but working with the private doctors as well.

Q. And on what occasion did that occur?

A. I mean, there had been numerous occasions. If you go to a doctor and let them know what the status is on the patient's medication or drug, they make the decision what they want to do and how they want to treat the patient. I don't make the decision to discharge the patient.

Q. I'm not asking whether you made the decision to discharge the patient, but whether you had ever communicated with management when you or any other individual besides going to the doctor to say this can't be -- I can't find this medication, I'm asking if you had ever had an occasion where you were unable to locate a medication to pull and didn't discuss it with anybody other than the doctor?

A. I mean, there's been occasions I asked other techs if you can help me find that medication because I can't find it. So I have in the past asked other people to help me find medication. If I didn't see it, maybe somebody else, a second eye will see it.

Q. And am I correct in this situation you did not do that, you didn't talk to anybody else other than advising the doctor that you couldn't find it?

A. I don't remember if I did or if I didn't.

Q. Well, you didn't say here you consulted with anyone, correct?

A. I don't remember if I did or if I didn't.

MS. WALSH: Off the record.

\- - -

(Whereupon, an off-the-record discussion was held.)

- - -

BY MS. WALSH:

Q. Ms. Wells, was Tina Centinaro an op tech who worked at the Mid Atlantic Wills location during any point in time that you were employed there?

A. Yes.

Q. And was Christina Rodriguez an op tech who worked at that practice location at any point when you worked there as well?

A. Yes.

Q. When the March 20th meeting took place with you regarding the written warning that we discussed marked as Wells-15, who was present?

A. I think it was Shelly, Ed and Kristen.

Q. And do you have any recollection of advising them that you had no recollection of the day in question involving the patient who had been discharged?

A. I don't remember.

Q. Do you know if the Podus, if you were able in the Podus system to look up medication that you said you were unable to find that day?

three points he replied specifically to that point with the same number?
A. He did.
Q. Do you know what a tap and inject procedure is?
A. Yes.
Q. What is it?
A. A procedure for a patient who has ophthalmitis. They have to get fluid drained from their eye, biopsy.
Q. So the tap and inject procedure is the procedure to drain the fluid?
A. To drain the fluid and then inject antibiotics into the eye.
Q. Prior to April of 2015, in the course of your experience as an op tech at Mid Atlantic, had you prepared a patient for a tap and inject procedure?
A. Yes.
Q. Had you ever prepared a patient for a tap and inject procedure even before you worked at Mid Atlantic?
A. No.
Q. No?

A. No.

Q. With regard to the op tech job responsibilities for preparing a patient for a tap and inject, what is the preparation that the op tech does?

A. Basically numb the patient's eye, get the medication, the antibiotics that the doctor wants to inject into the eye and the doctor -- well, he does everything else, but basically have the patient sign the consent forms and numb the eye with numbing drops for the doctor and get the medications.

Q. So first is have the patient sign the consent form?

A. Yes.

Q. And I'm just asking you about what you are responsible for doing as the op tech for preparation of this procedure.

A. Yes.

Q. So arrange for the patient to sign the consent form and then you as the op tech would numb the eye?

A. Yes.

Q. And how do you do that?

A. With a numbing drop with Proparacaine.

Q. And anything else after numbing the eye?
A. And Betadine.
Q. For what?
A. Betadine, you give them a drop of Betadine to clean the eye.
Q. So both the numbing drop and the Betadine drops?
A. Yes.
Q. Anything else?
A. And that's basically it.
Q. Is there anything else you do as an op tech to prepare the patient for a tap and inject procedure that involves otherwise, I don't know, marking the eye in some way or putting --
A. You can put a sticker over the eye that's going to be injected.
Q. And in the course of the steps you just gave me, where does putting the sticker over the eye come in?
A. It could be before or after they sign the consent.
Q. Okay. And are you supposed to have the patient sign the consent before you put the drops in?

A. Yes.

(Consent form and attachments were marked Wells-18 for identification.)

BY MS. WALSH:

Q. The series of documents that have been marked as Wells-18 are Bates labeled MAR 0081 through MAR 0085. The first page, is this a consent form for Mid Atlantic Retina?

A. Okay.

Q. Do you agree with me that it is?

A. Yes.

Q. And am I correct that the procedure described here is a tap and inject, is that AC tap?

A. Yes.

Q. Yes?

A. Yes.

Q. Okay. For sample and diagnosis, injection of intravitreal antibiotics for?

A. Endophthalmitis.

Q. And that is the condition you described earlier, right?

A. Yes.

Q. Do you understand that because of the confidential nature of the medical records, I am

representing to you patient's name is redacted from this document?

A. Yes.

Q. And is that your signature?

A. Yes.

Q. As a witness, correct?

A. Yes.

Q. And there again is a patient's signature next to that that's redacted, but under it's dated 4/7/15?

A. Yes.

Q. So you would sign as a witness to the patient's consent that you just described to me earlier?

A. Yes.

Q. Okay. The condition that's described here for which you said a tap and inject procedure is done, would you agree with me that the eye is typically red?

A. Yeah, yes, sometimes.

Q. And do you have any understanding as to how that condition could come about?

A. It comes in various forms. The most common I have seen, and I'm not a doctor so I can't really

give a medical opinion on that, but most people get it from cataract surgery or a prior surgery.

Q. So could be cataract surgery. Do you know if it could also be caused by an infection?

A. Well, yeah, bacteria got in during the procedure.

Q. And so in addition to being red, is there inflammation that can be seen?

A. I guess so.

Q. Do you have any understanding as to what can happen if an individual has this condition and it's untreated?

A. Again, I can't really answer that, professionally give my opinion on it.

Q. Okay. So if it goes untreated you don't know what could happen, whether a patient could sustain vision loss or anything else?

A. Um --

Q. You don't know?

A. They probably could.

Q. Okay. So on April 7, 2015 you prepared a patient for a tap and inject, correct?

A. Yes.

Q. And the additional documents here

associated with this patient again with the redactions of the patient's name, if you go to the third page in the upper right-hand corner am I correct that the fellow was Dr. Sridhar?
A. Yes.
Q. And the condition that you described is represented on this form as well, correct?
A. Correct.
Q. Okay. The patient that you prepared for the procedure that day, do you have any recollection of that patient?
A. Um, somewhat, not really.
Q. Could you recall if the patient was a female?
A. I believe she was.
Q. Do you recall whether you put the sticker on the patient's eye?
A. I think I did, yes.
Q. And do you recall that you put drops in the patient's eye?
A. Yes.
Q. And was it the numbing drops or the Betadine drops or both?
A. Probably Betadine -- Proparacaine first,

the numbing drop, never give the Betadine first.

Q. Okay. And am I correct that the patient at that point called to your attention that you had marked and put the drops in the incorrect eye?

A. I believe so.

Q. What do you recall the patient saying?

A. I don't recall. I think she said something like it's the other eye, something like that.

Q. Did you also prepare or fill out any instructions about the drops for this patient?

A. Probably.

Q. And am I correct that the instructions that you filled out were for the incorrect eye?

A. I don't recall. Is it in here?

Q. Are you aware as to how the fact that you had marked and had put drops in the incorrect eye of this patient had come to the attention of management?

A. No.

Q. Okay. So the fact that the patient had specifically come in and made a complaint in a meeting with Ed Weber you're not aware of?

A. No.

Q. Okay. The next day, April 8th, is when the

any response with regard to the actual happening of the situation when you did the preparation for the procedure for this patient, right?
A. No.
Q. At the suspension meeting, who did you meet with?
A. I believe it was Ed, Kristen and Shelly.
Q. Did you say anything at that meeting?
A. No.
Q. No?
A. No.
Q. And again, the only written response to that disciplinary action is the one we marked as Wells-20, correct?
A. Correct.
Q. Okay. And am I correct that the E-mail that you sent was later in the day after you had left?
A. Yes.
Q. In response to the suspension, right?
A. Probably, yes.
Q. You have the suspension meeting and then you were put on the unpaid suspension? Was it unpaid?

A. Yes.
Q. And that was for three days?
A. Yes.
Q. Okay. Do you know if any other op techs employed at the Mid Atlantic location at Wills had ever been issued any suspension as a disciplinary action?
A. Not that I know of.
Q. That doesn't mean there weren't any, correct?
A. Doesn't mean there weren't any.

(Warning was marked Wells-21 for identification.)

BY MS. WALSH:
Q. The document marked as Wells-21, do you recall having this warning issued to you?
A. Yes.
Q. And am I correct that this was a written warning after the suspension that was issued that you signed on May 1st of 2015?
A. Yes.
Q. And the date of infraction was April 28, 2015?
A. Yes.

Q. And am I correct it lists the previous mornings of the verbal written on March 2nd, the written on March 20th, and the suspension on April 7th?
A. Yes.
Q. And do you have any recollection as to how this infraction was discovered?
A. Not really, no, I don't.
Q. And am I correct that the infraction for which you were issued this warning involved signing out a drug without checking the Avastin grid? It was an Avastin injection, correct?
A. Correct.
Q. Remember we talked about earlier there was an insurance grid, correct?
A. Yes.
Q. And there was also an Avastin grid; is that right?
A. Yes.
Q. And in this case the patient had insurance which needed authorization prior to injection; is that correct?
A. Correct.
Q. And in this case you had not checked the

grid to confirm whether or not pre-certification was required before the injection was actually administered by the doctor?

A. Yes.

Q. Am I correct that this was a new patient?

A. Probably.

Q. And so as we discussed earlier with it being a new patient who was examined by a fellow and to then have an injection while that patient was there at that first visit meant that the patient did not have the information on the form to indicate that billing had already provided whether authorization was required or whether it was covered by insurance?

A. Correct.

Q. And per your responsibility as an op tech in service, then you would need to have checked the grids and as we discussed earlier if it turned out that you did, you would have seen that this patient for the insurance that he or she had required authorization; is that right?

A. Correct.

Q. And as we discussed earlier if, in fact, such as situation occurred with a new patient, then

it was your responsibility to review it with the physician and the physician would then present the options that we talked about before?

A. Um, yes.

Q. And those options would include for example, you can pay out of pocket, you can, meaning the patient, reschedule the procedure once the pre-certification is received; is that right?

A. Yes.

Q. So in this case because you had failed to check, then this patient was, in fact, given the injection when a pre-certification was actually required before it should have been given; is that right?

A. Okay.

Q. Well, am I correct that --

A. Yes.

Q. -- because you had failed to check and turns out this patient had insurance that needed authorization, the medication was then injected and that patient needed pre-certification before it should have been administered; is that right?

A. Yes.

Q. Do you know whether Mid Atlantic was ever

able to recover the revenue associated with the administration of this medication because it had not been pre-certified before it was administered?

A. If I remember, yes, they were.

Q. And do you know what the amount is that you believe they recovered?

A. I don't know.

Q. Do you know what the cost would have been if it wasn't recovered?

A. I think it's like 250.

Q. Isn't it almost like $500?

A. Not that I know of.

Q. Do you know if any other op techs at the Wills Eye location had ever been issued any disciplinary action for not checking or confirming that authorization from insurance was needed before an injection was given to a patient?

A. Not that I am aware of.

Q. Doesn't mean it didn't happen, right?

A. Correct.

Q. As of the time that the written warning was issued on May 1 of 2015, pursuant to the discipline policy set forth in the handbook we went over earlier, am I correct that any infraction or basis

for a warning after that written warning would take you to the end of the procedure as a termination?

A. Yes.

Q. In your case am I correct that none of the steps in the procedure were skipped by Mid Atlantic?

A. No, they were not.

(Termination document was marked Wells-23 for identification.)

BY MS. WALSH:

Q. The document that has been marked as Wells-22, am I correct that this is the termination document that was presented to you on July 10, 2015 with the most recent infraction being July 1, 2015?

A. Yes.

Q. And am I correct that the previous warnings identified are the verbal written on 3/2, the written on 3/20, the three-day suspension on 4/7, and the written that was on April 28?

A. Yes.

Q. Okay. And that the last infraction that occurred on July 1, 2015 was described as a failure to correctly code a procedure creating a potential loss of revenue for the practice and that there was a medication Avastin injection that you signed out

in Podus and the fee ticket wasn't appropriately filled out with regard to billing the patient's insurance, did I summarize that correctly?

A. Yes.

Q. Do you know whether any other op techs at the Wills Eye location of Mid Atlantic's practice had ever been issued any disciplinary action associated with a failure to correctly or completely code procedures on a fee ticket?

A. Not sure if they were disciplined for it, but it happened frequently.

Q. So whether any op techs had, in fact, been issued any sort of disciplinary action you're not aware of?

A. I'm not aware of it.

Q. Okay. And each time that you were presented with a warning, am I correct that members of management met with you?

A. Correct.

Q. In each of those occasions?

A. Correct.

Q. With regards to the potential loss of revenue for the failure to follow that procedure with regard to coding on the fee ticket, do you know

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

* * *

KIMBERLY WELLS :
:
V. :
:
RETINOVITREOUS :
ASSOCIATES, LTD d/b/a :
MID ATLANTIC RETINA : NO. 15-0478

* * *

August 6, 2015

* * *

Oral deposition of CANDACE TRACY LEONARDO, held in the Law Offices of Weber, Gallagher Simpson, Stapleton, Fires & Newby, LLP, 2000 Market Street, Suite 1300, Philadelphia, Pennsylvania 19103, commencing at 9:57 a.m., on the above date, before Hope Agosto, a Professional Court Reporter and a Notary Public.

* * *

R&K REPORTING, INC.
Court Reporting Services
PO Box 1372
Levittown, Pennsylvania 19058-1372
Phone (215) 946-7009 Fax (215) 949-1867

A. Huntingdon Valley, Pennsylvania.
Q. When did you go to Plymouth Meeting?
A. January of 2012.
Q. Have you been located at any other locations other than Plymouth Meeting and Huntingdon Valley?
A. I travel to all of our offices.
Q. How many offices is that in total?
A. 16.
Q. How many states are those offices located in?
A. Three.
Q. What states are those?
A. Pennsylvania, New Jersey and Delaware.
Q. You travel to all 16 of those offices?
A. Correct.
Q. Do you have an office in Plymouth Meeting?
A. Yes.
Q. When did you start working for Mid Atlantic?
A. January of 2007.

Q. Have you been a director of clinical operations during your entire employment with Mid Atlantic?
A. No.
Q. When did you become director of clinical operations?
A. January of 2012.
Q. What were you prior to building director of clinical operations?
A. Office manager.
Q. Were you the office manager of the Huntingdon Valley location?
A. Yes.
Q. When did you become the office manager of that location?
A. January of 2007.
Q. Is that the first position that you had with Mid Atlantic?
A. Yes.
Q. What are your job responsibilities as the director of clinical operations?
A. I oversee the clinics for our practice.
Q. What are your responsibilities with

Q. That's Wills Eye Hospital?
A. That's our Wills Eye office. I don't work for the hospital.
Q. That's located in Wills Eye Hospital?
A. Yes.
Q. What is your participation with regard to Wills Eye outside of your general responsibilities with regard to policies and protocols or at least creation of them and overseeing tech training?
A. I'm not sure I understand the question.
Q. What is your responsibility with regard to overseeing employees located at the Wills Eye location?
A. So as the director of clinical operations, the technicians and surgical coordinators that are in that office have a job description, which is the same as all of our technicians and surgical coordinators. So I would work with the manager there to make sure that they're fulfilling their obligations. We also integrate clinical research into our practice and I at times go there to meet with

the dates. It might have been '12 into '13, that sound about right.

Q. Was there a certain position that you served as during that period of time while you were at Wills?

A. Interim clinical manager.

Q. Did you have any involvement in who was going to replace you as the clinical manager?

A. I was never the clinical manager at Wills.

Q. Who was going to succeed Ms. Willis?

A. Yes.

Q. During your time as interim clinical manager at the Wills Eye location, were you also serving as the director of clinical operations simultaneously?

A. Yes.

Q. Were you responsible for directly supervising any employees during that time in your position as interim clinical manager?

A. The technicians at Wills Eye.

Q. Are there different types of technicians at Wills Eye?

A. Yes.
Q. What different types are there?
A. We have retinal photographers, we have what we call vision technicians, and we have what we call back technicians.
Q. Do those all fall under the umbrella of ophthalmic technicians?
A. Yes.
Q. Was there one type of ophthalmic technician position at Wills Eye or were there multiple types of different positions?
A. There were the three that I just mentioned.
Q. So those were separate positions, each of them?
A. Not necessarily. You can be a vision tech and be trained on additional clinical skills and become a back technician. You can also be trained to become a photographer.
Q. Do you know if there were technicians at Wills Eye who were solely back techs?
A. Doing both positions, is that your question?
Q. When you say both positions, what do

A. 18 or 19.
Q. Could you estimate how many there were during the time you were interim clinical manager?
A. There may have been 14 or 15.
Q. Those different areas of technician work, are those treated as separate positions at least at the Wills Eye location?
A. I'm not sure I understand.
Q. You listed as different types of technician work, retinal photographers, vision techs and back techs, correct?
A. Correct.
Q. Are they treated as separate positions at the Wills Eye location?
A. For hiring purposes?
Q. For any purpose.
A. I mean, when we hire a technician, the expectation is that they're going to be cross-trained to be able to do anything so they may be a vision tech and turn into a back tech. I'm not sure if that's answering your question. We also like to cross-train our technicians into photography.

Q. Are all the technicians hired with a certain title?

A. Vision techs and ophthalmic technicians or back technicians, excuse me, would be lumped into ophthalmic technicians. In that particular location, we have photographers that are hired as photographers. We also have technicians that train to become photographers.

Q. Are there techs at that location who train to do photographer duties and then eventually do photographer duties full-time?

A. Currently, I don't know.

Q. Do you know if that's ever been the case?

A. I don't know if that's ever been the case. I haven't been employed with the practice as long as that office has been existing.

Q. Do you know if that's been the case at any point during your employment, one way or the other?

A. Not that I'm aware of.

Q. Do you know if there's a separate job

description for people who only perform the photographer duties as technicians?

A. Yes, there is.

Q. Are you familiar with the job duties of an ophthalmic technician?

A. Yes, I am.

MS. WALSH: Off the record.

* * *

(Whereupon, there was an off-the-record discussion.)

* * *

BY MR. SEILER:

Q. Are the job duties of an op tech different at the Wills Eye location than they are at the other locations?

A. No.

Q. What are the job duties of an op tech at the Wills Eye location or at any location?

A. Patient history taking, performing what we term a vision, which is taking a basic vision on a patient. Do you want me to go through exactly what they do when they do that or do you just kind of want a generalized --

Q. I am going to be asking you

specifically what those each entail, so if you have a preference on how you do it.

A. They take a patient's vision. They take a patient's intraocular eye pressure. They check a patient's pupils for size, or also what's called a Marcus Gunn, with two Ns, pupil.

Q. Is this all under performing vision or separate responsibilities?

A. It was all under performing vision.

Q. What was the last thing you listed?

A. They check for Marcus Gunn, two Ns, pupil. They confirm a patient's drug allergies, if any. They review all medications that a patient may be taking with the patient. They perform what's called a confrontation test. They confirm with the patient who their primary care physician is, if a doctor referred them to the practice, who was that physician; if they're a diabetic, who their endocrinologist is; if they are a diabetic, what their most recent blood sugar and their labs for their diabetes, their most recent A1C results from their lab work. They're basically

collecting information for the physician.

Q. What is an A1C?

A. It's a test that determines whether or not their blood sugar has been consistently high or low.

Q. Is there anything else that you haven't mentioned yet with regard to performing vision?

A. I believe I have covered it all.

Q. That A1C that you mentioned, is there a physical process that goes along with that?

A. A1C is a lab test and we do not do labs in our office. We ask the patient, when was the last time they had the test performed by either their primary care physician, or their endocrinologist would have ordered it, and if they know what the results are.

Q. You mentioned performing a confrontation test?

A. Correct.

Q. Is there any physical process involved with that?

A. For the technician?

Q. Yes.

do 20 in a day. They could do 50 in a day. It varies day by day.

Q. Are techs who perform visions in a particular day assigned to particular doctors?

A. No, not when I was at -- not when I was interimly at Wills.

Q. Would they just be assigned to whoever had appointments scheduled?

A. Typically. Actually, let me rephrase that. We also do retina service, which is part of Wills Eye Hospital. We typically did assign one technician to them. They're a different entity.

Q. What is retina service?

A. It's part of Wills Eye Hospital. They would be patients that would be referred from our services in the hospital to see our physicians. It was separate from our private practice.

Q. What the purpose of retina service?

A. So the specialties at Wills Eye hospital, there's retina, glaucoma, oncology. They're made up of private practices, the services; plus, the physicians have their own

private practice. In other words, glaucoma is a good example. There are three different practices who doctors go in and see the patients from Wills Eye Hospital. Maybe they came through the ER and then saw cornea and cornea referred them to glaucoma, they would stay a Wills Eye patient as opposed to a private practice patient.

Q. The retina service, was that directed towards Wills Eye patients?

A. Yes.

Q. Was there a certain number of op techs who were assigned to retina service on a particular day?

A. It would be based on the volume; typically, at least one, and if it's a high volume, we would ask all of the vision technicians to, with teamwork, work with one another to make sure that all of the patients were worked up.

Q. In that retina service, were there still op techs performing, for instance, back technician duties, vision technician duties and retinal photography?

A. Yes.

Q. Was there a certain floor that Mid Atlantic Retina was located on?

A. Tenth floor.

Q. Was the retina service located on the tenth floor as well?

A. Yes.

Q. Was it located in a separate office location than Mid Atlantic Retina?

A. No, same suite.

Q. Was retina service overseen by the same management as Mid Atlantic Retina?

A. Yes.

Q. You mentioned patient history taking, performing vision. What are the other duties of an op tech?

A. A vision technician or --

MS. WALSH: Initially, the question was op technician duties, right, when you described the answer you gave earlier.

BY MR. SEILER:

Q. Are there any other duties outside of the patient history taking and the visions that

are performed by op techs who do vision tech duties?

A. The vision tech duties, that's everything that is -- already what I said.

Q. What are the duties associated with back technicians?

A. It would include everything that we just discussed for the vision technicians. It would include setting up procedures for patients, including reviewing consent forms, making sure that we have them signed after the doctor has explained everything; depending upon the procedure, the setup is different for different procedures. Making sure the patient understands what to expect afterwards, answering general questions if they can, if it's within their scope that the patient may have. They also scribe for our physicians, which would be chart documentation during an exam, and there are technicians that perform photography duties.

Q. When you say back tech or back technician, why is it called a back technician?

A. Typically, the vision techs are at

back duties would be setting up procedures?
A. Correct.
Q. And also scribing for physicians and the other things that you listed?
A. Correct.
Q. Do you know how many different procedures there are that are under the back technician umbrella?
A. We do intravitreal injections. We do different types of laser procedures. We also do what are called pneumatic retinopexies, P-N-E-U-M-A-T-I-C, retinopexy.
Q. When you said scribe for physicians, was that done with the doctor in the room?
A. Yes.
Q. The intravitreal injections, does that involve some type of physical process for technicians?
A. Technicians typically are standing when they are preparing a patient. The preparation includes giving them an anesthetic eye drop, as well as betadine in the eye. These are the physical things involved.
Q. Is there anything else physical

involved in that process for a technician?
A. Depending upon a physician preference process, technicians at times will hold the upper and lower eyelids of the patients open, or they may just hand things to the physician.
Q. Anything else physical?
A. No.
Q. So there's two different eye drops that can be administered to patients by the technicians?
A. Correct.
Q. And the technician would be the one to drop that in the patient's eyes?
A. Correct.
Q. How many drops are there for -- what were the different names of the eye drops again?
A. We give an anesthetic.
Q. How many drops is that?
A. There's a process that we go through. For the eye that's being injected, they're given one drop of the anesthetic, followed by one drop of betadine, and then we repeat that, one drop of anesthetic, followed by one drop of

betadine.

Q. In the other eye?

A. That same eye, the eye that's being treated.

Q. So four total drops into the one eye?

A. Correct.

Q. Is anything put in the other eye?

A. No.

Q. To do those injections, how long does that process take?

A. To put the eye drops in?

Q. The entire procedure.

A. Setting up an entire procedure can take anywhere from six to 15 minutes, depending upon exactly what's being done and whether it's a new patient or a follow-up patient and how many questions the patient may have or family members.

Q. So the techs are just involved with the setting up of those procedures?

A. The technicians also make sure that the patient's insurance will cover the proposed procedure. So we either have investigated that in the past and we have it notated already, or

they call one of our billers to get that information. They make sure that we have a properly signed consent form. We have written instructions that we give to patients, we go over them verbally with the patient and the family member.

Q. Do they have that consent form filled out, obviously, before the procedure starts, correct?

A. Correct.

Q. Where would they discuss that with the patient?

A. Everything is done in the treatment room or procedure room.

Q. Once that is signed, what are they required to do with it?

A. Well, right now it's a -- for the time that I was down at Wills?

Q. Yes.

A. We had paper charts at that time, so typically, they signed as a witness, they had the patient sign it and it was filed in the patient's chart.

Q. Would that be in the same room?

A. Correct.
Q. The patient's insurance, would that be something they got directly from the patient?
A. When the patient registers for their appointment, comes and checks in at the front desk, all their insurance information is reviewed by the front desk staff.
Q. You said there's certain laser procedures?
A. Yes.
Q. What are the physical processes involved with that?
A. Consenting the patient, instilling anesthetic eye drop to the eye that's going to be treated, reviewing with the patient what they can expect immediately following the laser, answering any questions that the patient or family member may have that's within the scope of a technician, going over any instructions for at home that we're giving them in writing but we're verbalizing with the patient as well.
Q. Is there anything else involved with

that procedure?

A. Just usually explaining to the patient what's going to happen. They're usually a little afraid.

Q. How many eye drops are instilled during those procedures?

A. It's one type of eye drop, the anesthetic. Typically, we put at least two in to help ensure the patient is numb.

Q. Would that be in one eye or both eyes?

A. The eye that's being treated.

Q. Could that sometimes be both eyes?

A. It can.

Q. Outside of what you just discussed, is there any other physical process involved with the laser procedures with regard to the techs?

A. Laser procedures can be done with either the patient sitting in an exam chair or laying back. If they sit at the exam chair, we have to actually get the equipment up to the patient, close enough to their eye. So positioning a patient, we try to get that done

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY WELLS,<br>Plaintiff | : | CIVIL ACTION |
| | : | NO. 15-5675 |
| vs. | : | |
| | : | |
| RETINOVITREOUS<br>ASSOCIATES, LTD. d/b/a<br>MID ATLANTIC RETINA<br>Defendant. | :<br>:<br>:<br>: | |

Bensalem, Pennsylvania

March 3, 2016

Pretrial examination of EDWARD WEBER, taken on behalf of the Plaintiff at the Law Offices of Karpf, Karpf & Cerutti, 3331 Street Road, Bensalem, Pennsylvania, on the above date, commencing at 12:16 p.m., before Linda A. Ricciardi, Certified Court Reporter.

R&K REPORTING
Court Reporting Services
PO Box 1372
Levittown, Pennsylvania 19058-1372
Phone: 215-946-7009 Fax: 215-949-1867

of a judge and/or jury?
A. I do.
Q. The court reporter is taking down everything we are saying so try to give verbal responses as opposed to a shake or nod of the head or uh-huh, anything along those line, they don't translate too well to the transcript, okay?
A. Understood.
Q. Again, since the court reporter is taking everything down, let's try not to speak over one another. Even if you anticipate my question try your best to let me finish it, and I will do my best to let you finish your answer before beginning my next line of questioning, okay?
A. Okay.
Q. If any of my questions are confusing, I can guarantee you it will happen at least once, it happens every time, just let me know and I will restate or rephrase the question, because if you answer I will just assume that you understood my question exactly how I posed it and your answer was responsive to that

question, okay?
A. Okay.
Q. Are you under the influence of any medication or substance that would impact your ability to either recall events or to testify truthfully?
A. No.
Q. Are you presently employed at Mid Atlantic Retina?
A. Yes.
Q. Is that the Wills Eye location?
A. Correct.
Q. When did you start at Mid Atlantic Retina?
A. August of 2011.
Q. What was your title when you were hired?
A. When I was hired I was brought in as an ophthalmic technician.
Q. What is your present position?
A. Director of operations for our office at Wills Eye, not practice wide.
Q. When did you become director of operations at Wills Eye?

A. April of 2014.
Q. What are your job duties and responsibilities as director of operations?
A. My job duties are oversight of the Wills location, which includes our front desk, clinical operation, infrastructure. That is really basically broad.
Q. So you have supervisory management responsibility?
A. Correct. I have supervisors underneath me that care for each of those areas.
Q. What positions are supervisors underneath you?
A. Below me, I have a front desk supervisor, I have a clinical manager.
Q. Any others?
A. That is it.
Q. Do you directly supervise op techs, I think the phrase is --
A. I guess the correct term would be indirectly as there is a layer of management between myself and them, but I am very active.
Q. Just so the record is clear, when I say op tech I believe the technical phrase is

ophthalmic technician?

A. Correct.

Q. Are you involved in any way with the discipline of op techs at the Wills Eye location?

A. Yes.

Q. What is the extent of your involvement?

A. Being a higher level manager, it is common practice that when there are higher level discipline issues they will be elevated to me or I would be involved with their manager.

Q. What constitutes a higher level discipline issue?

A. Multiple infractions, repeat infractions, gross infractions or anything that may in any way jeopardize a patient.

Q. So for these higher level disciplinary issues is it your decision to issue the discipline or does the manager present it to you and you would confer about it collectively?

A. We will confer, but it will be my decision at that point.

Q. You confer with the manager?

A. Yes, very.
Q. Who makes the decision to discharge patients?
A. That decision would be made by the doctor.
Q. So if a physician or does a physician communicate his decision to discharge a patient to an op tech to your knowledge?
A. Yes, that's correct.
Q. If an op tech is instructed by a physician to discharge a patient is that op tech then required to follow the physician's orders?
A. Yes.
Q. If an op tech refused the physician's orders would that be a rule violation or against company policy?
A. I would -- the reason I hesitate is if there was something -- our op techs are also responsible to help give our doctors a full view of what is going on around them.
So it would not be unusual or out of place for an op tech to point something out to a doctor, but in the end the doctor still would

make that decision and that should not be questioned.

Q. So correct me if I am wrong, an op tech is essentially required to do what the doctor tells them to do?

A. Yes.

Q. Concerning discharging patients?

A. Correct.

Q. So would it be fair to say that if a physician tells an op tech to discharge patient X, patient X being an unknown patient, would it be fair to say that if the op tech does, in fact, discharge that patient pursuant to the doctor's orders that op tech is not in violation of any company rule or policy?

A. That's correct.

Q. I assume you know who Kimberly Wells is?

A. Yes, I do.

Q. You are aware that she filed a lawsuit prior to the pending lawsuit for which we are here today, right?

A. Can you repeat that?

Q. We are taking your deposition in

relation to a specific lawsuit that Kimberly Wells has filed against Mid Atlantic Retina?
A. Yes.
Q. Are you aware of any prior lawsuits she filed before the one we are here for today?
A. No, I am not.
Q. You have no knowledge whatsoever. You had a deposition taken before, right?
A. Correct. I'm sorry, yes, I wasn't understanding. I was thinking we were in the same process.
Q. Do you have a general idea of when you became aware of the prior lawsuit?
A. I believe it was somewhere around March of 2015.
Q. Do you recall how you became aware; in other words, who told you?
A. I was told by Rhonda Ceretelle that there was a meeting that we were going to be attending within the next two weeks or so with counsel.
Q. Prior to that meeting did Rhonda tell you anything else about the pending lawsuit?
A. No.

Q. So what exactly did she tell you; she just told you there is a meeting with our attorney?
A. She told me at that time there was a lawsuit involving Kim Wells and that I was going to need to attend a meeting that would include our lawyers.
Q. Just so we are clear, I am not going to ask you about any questions about any meeting that your lawyer was present at.
A. Okay.
Q. Was there any meetings among yourself or other Mid Atlantic Retina employees concerning the allegations in the prior lawsuit, where your attorney was not present?
A. Can you say that again?
Q. So the prior lawsuit is filed, you learn of it in March of 2015, you have a meeting with your attorney two weeks later, approximately?
A. Uh-huh.
Q. Did you have any meetings with other employees about the lawsuit at which your attorneys were not present?

Q. After Rhonda told you about the EEOC charge in April 2014 did you discuss it with anybody else at Mid Atlantic Retina that was not your attorney?
A. No.
Q. Aside from Diana and the unknown tech I assume, right?
A. And, again, I did not even disclose to them that I was previously aware of that.
Q. They just came to you with concerns?
A. Yeah.
Q. Are you aware of the reasons for which Kimberly Wells was terminated from Mid Atlantic Retina?
A. Yes.
Q. What is that reason or reasons, if there are more than one that you are aware of?
A. The reasons for termination?
Q. Yes.
A. Final reason for termination?
Q. All the reasons you can think of.
A. Was multiple infractions of procedures and policies. There was a gross misconduct charge within the midst of that, and there were

repetitive infractions.

All of those things are outlined in our handbook as actionable items.

Q. Other than what you mentioned, is there any other reason that contributed to the decision to terminate Ms. Wells or did you cover everything?

A. Yeah, it was based on those items.

Q. Concerning the actual decision to terminate Ms. Wells, can you identify everybody who was involved in that decision?

A. Decision makers, is that what you are asking?

Q. Yes.

A. Myself, Shelley Bednar, who reviewed everything, and John Duemmel, who is our CEO.

Q. You said Shelley reviewed everything. What did she review to your knowledge?

A. Shelley reviewed any documents, any actions that I would write. It is common practice for me to contact her to review an action, make sure. I always want to be sure I am following the handbook to the letter.

Q. So she reviewed the disciplinary

would have been there.
Q. Aside from Kristen would you have expected anyone else to be there?
A. No.
Q. Do you recall Kristen being there?
A. No, I don't.
Q. I will refer to that as the termination meeting. Prior to the termination meeting did any of the employees of Mid Atlantic Retina meet outside the presence of Kimberly Wells to discuss the decision to terminate Kimberly Wells?
A. There was no physical meeting.
Q. Was there some type of correspondence or communication?
A. There was communication between myself and Shelley upon the last infraction and the time leading up to the discharge.
Q. Was communication through email or the phone?
A. Could have been both.
Q. Do you recall what was discussed during those communications?
A. I recall when the final infraction took

place calling Shelley and saying my understanding is at this point we have another repetitive disciplinary situation, and it was my opinion that I thought that we had run our course, you know, doing as much as we could do to educate, reeducate, and I felt that there were multiple violations at that point.

Q. During these communications between yourself and Shelley was the prior lawsuit brought up or discussed or referenced in any way?

A. No.

(Whereupon warning notices were marked for identification as Weber-2.)

BY MR. CHASE:

Q. In front of you is a document marked Weber-2, take as much time as you want to review it, familiarize yourself with it.

A. Okay.

Q. Did you have a good enough chance to review Weber-2?

A. Yes.

Q. So we can agree that Weber-2 includes five written disciplinary actions taken against

the lower right-hand it is marked MAR 0095.
A. Uh-huh.
Q. You see under the section that says employee comments?
A. Yes.
Q. Do you know would that be Kimberly Wells' handwriting to your knowledge?
A. To the best of my knowledge.
Q. Did you ever conduct any investigation regarding her comments aside from your discussions with Kristen?
A. I just want to look back over this before I...
Q. Sure.
A. I'm sorry, can you restate your question?
Q. Yes. So Kimberly Wells made some comments on the disciplinary action dated March 2, 2015. Did you ever conduct any type of investigation into her comments aside from speaking with Kristen Winkelspecht?
A. No. The reason being that this infraction to me, from a management standpoint is all about the fact that this drug was not

taken out of our PODIS system. That is what this infraction is about.

Q. The next disciplinary action dated March 7, 2015, which is marked MAR 0092.

A. Uh-huh.

Q. Concerning the March 3, 2015 infraction, there is some comments in there about Kim discharging a patient and rescheduling the patient to return another day. Now, you testified earlier an op tech didn't actually discharge patient it was the physician's orders, right?

A. Correct.

Q. Is there any written rule requiring an op tech to speak with their manager or supervisor before following a physician's orders to discharge a patient?

A. Can you rephrase that?

Q. You want me to rephrase it or restate it?

A. Restate it.

Q. Why don't we have the question read back?

(Whereupon the court reporter read

back from the record.)

THE WITNESS: It is the responsibility of the op tech to provide the physician with all the parameters for them to make a decision, and to make a decision for discharge.

The reason I say that is, in a case like this it was incumbent upon Kim to have all the information to present to the doctor.

If Kim went and said we don't have her drug, the doctor might say then let's reschedule her for another day.

On the other hand, if Kim went to her manager and said what do I do, I don't see the drug, there were other options available.

BY MR. CHASE:

Q. Is there any written rule or policy that requires an op tech to go to their manager if they cannot locate a drug before advising the doctor that the drug can't be located?

A. There is not a written policy, however, it is common procedure, because we have four

refrigerators in that office, to go to the manager if something that you expected to be there is not there, you would be expected to go ask a manager.

Q. What is the basis of that expectation if there is not some written policy or procedure?

A. Personally I think it is good common sense.

Q. Was Kim Wells terminated for not having common sense?

A. No.

(Whereupon email was marked for identification as Weber-3.)

BY MR. CHASE:

Q. Let me know when you have reviewed that?

A. Uh-huh. Okay.

Q. Weber-3, is that an email that was sent by Kimberly Wells on April 20, 2015 to your attention as well as Bednar?

A. Yes.

Q. I am not going to read the entire text of the email, and I will summarize, and let me

employee would make any kind of allegation as employees might do, if it is of this nature then I immediately send it right on to HR.

Q. Is that the full extent of your participation in any investigation?

A. Typically. I usually send it on and then I would assume that HR would then handle any kind of claim like that. About the only thing I might do is counsel the actual employee that if they felt I was not fair they should take it up with our HR department, that is what they are there for.

Q. Do you recall ever counseling Kimberly Wells, either after this email, Weber-3, or the other email you mentioned earlier?

A. I could not say for sure.

Q. Would you agree with me that in the process of reaching the decision to terminate somebody you take steps to ensure that the termination is absolutely legitimate; in other words, the discipline that they were written up for actually happened as it was written up, right?

A. Painstakingly so.

Q. Would you also agree with me that you'd take steps to ensure that the termination is lawful?

MS. WALSH: Objection. He is not a lawyer. He can answer.

THE WITNESS: I would not feel that I was qualified for that, that is why I rely on my HR department.

BY MR. CHASE:

Q. You think the HR department is qualified to make a determination what is or is not lawful?

A. I believe they would go to the next step and confer with our counsel. It wouldn't be my place to do that.

Q. At the time you decided to terminate Kimberly Wells you are aware of the pending lawsuit, right, the prior lawsuit?

A. At that time, yes.

Q. Did you have any concern that the termination could be perceived as retaliatory at the time you made the termination?

A. No.

Q. Prior to reaching the decision to

terminate Kimberly Wells did you have any discussions or conversations or meetings with anybody at Mid Atlantic Retina addressing the issue of whether or not the termination would be perceived as retaliatory?

A. I was very careful with each of these write ups to make sure that they were right and they were correct and they were justified.

Q. I don't think you really answered my question.

A. I had concern once I was aware.

Q. You had concern that?

A. I have to answer honestly.

Q. Okay.

A. There was concern in my mind that I wanted to make sure that everything was right.

Q. Concerned that the termination may have been perceived --

A. Once I was aware of the lawsuit, correct.

Q. So if I understand your testimony correctly, you had concerns that the termination may be perceived as retaliatory in response to the federal lawsuit?

A. Yes.
Q. Did you discuss those concerns with anybody at Mid Atlantic Retina?
A. I have to think about that. I don't know that I verbalized that.
Q. So it was your internal thought process?
A. My internal thought process, yes.
Q. Do you know if anybody else in the decision making or disciplinary process had any concerns as to whether or not the termination would be perceived as retaliatory?
A. I believe -- can you restate that question?
Q. Can you read it back?

(Whereupon the court reporter read back from the record.)

THE WITNESS: I know that we took great care to make sure we were doing the right thing. I know that at one point in time one of these actions we had conferred with counsel at that time.

BY MR. CHASE:

A. No, this was my investigation, it was brought directly to me.

Q. So when you said that information with regard to the circumstances leading up to any of these warnings that came from Kristen Winkelspecht, the suspension document in the disciplinary process, did she have anything to do with the actual investigation or the decision making process as to which --

A. No.

Q. -- level of discipline would be issued?

A. No, Kristen did not.

Q. How did the circumstances leading to the suspension come to your attention?

A. One of the technicians came to me and told me that there was a patient who had voiced concern about her care the day before, and they wanted to speak with a manager.

Q. Did you meet or speak with the patient?

A. Yes, I did.

Q. Was the patient male or female?

A. Female.

Q. When you saw the patient was there anything visible about the patient's eyes to

you?
A. Yes.
Q. What was it?
A. She visibly had a very red inflamed eye.
Q. By way of summary, am I correct that the incident that took place was that this patient's, the wrong eye that was to undergo a procedure, injection procedure, had been marked by Ms. Wells?
A. That is what the patient reported to me.
Q. Did you document the information that was communicated to you by the patient when you met with the patient?
A. Yes, I did.
Q. As a result of the investigation that you conducted did you determine that, in fact, Ms. Wells had engaged in what was the infraction described here on the document that has been marked?
A. I'm sorry, can you repeat?
Q. As a result of your investigation that you conducted did you determine that Ms. Wells

had, in fact, engaged in the gross misconduct that is described in the infraction portion of this document?

A. Yes, I have.

Q. With regard to the first page of exhibit, the March 2, 2015 warning, did you have a discussion or meeting with Ms. Wells and Ms. Lallo?

A. Yes, yes.

Q. So before the warning was actually issued and presented to Ms. Wells did you investigate the situation by speaking to both Ms. Wells and Ms. Lallo?

A. Yes, I did.

Q. At the meeting that you had where you spoke to Ms. Wells even before the warning was issued did she communicate to you the same or similar information that she wrote on the employee comment section?

A. Yes, she did.

Q. So you did speak to her about what she wrote on the comment section, but it was at a meeting before you actually issued it?

A. Correct.

Q. With regard to the next warning that was issued on March 20, 2015, how many infractions occurred which served as the basis for this written warning?
A. Are you referring to the failure to correctly code?
Q. I am asking about all infractions. How many infractions made up the basis for this written warning to be issued?
A. There is a total of three infractions here.
Q. Is the first infraction that is listed on March 3 of 2015 failure to meet reasonable standard expectations of work performance?
A. Uh-huh.
Q. Is that the infraction that you advised counsel for Ms. Wells involved the situation where Ms. Wells had discharged a patient at the direction of a doctor?
A. Yes.
Q. Was that the situation where the drug was actually there on hand and the patient could have actually had the treatment instead of being discharged?

A. Correct.

Q. Even if the March 3, 2015 infraction had not taken place, okay, would Ms. Wells have been issued a written warning for the infractions that occurred on March 12 and March 17 that are also listed on this document?

A. Yes.

Q. So even if March 3 hadn't happened at all, would the failure to correctly code a procedure involving a total of three injections being delivered without being documented on the fee slip, would the failure to correctly code three injections have lead to a disciplinary action to be issued to an op tech?

A. Absolutely.

Q. That would have included Ms. Wells?

A. Correct.

Q. The fact, if you can just explain, the fact that Ms. Wells did not document that three injections were delivered to patients on two different dates, what did that mean, the fact that she didn't document them?

A. That could lead to loss of revenue. It could also lead to later within let's say one

to two days if we discovered that, okay, and we find that mistake, that is also problematic.

It is important these things are done in real time because once our billing claims go out to insurance companies and we have to make a retraction there is penalties assessed for that.

Q. With regard to each of these three injections on these two dates, were those patients actually administered injections?

A. Yes.

Q. Then is it the op tech's responsibility to document on the fee slip that a patient received an injection?

A. Yes.

Q. So in these three cases did Ms. Wells actually fail to document on a fee slip that the patient actually received treatment in the form of an injection?

A. Yes.

Q. The document that was marked Weber-3, I believe?

A. Yes.

Q. This email that Ms. Wells sent on April

2015 email was there anything of a factual basis involving what happened with the patient that you believed as a result of what was communicated by Ms. Wells you needed to go back over the investigation that you had conducted?

A. No, I had no reason to. I believe she even -- the only thing she recalled was that she, in fact, put the sticker on the wrong eye of the patient. That was about the only information that she provided.

Q. With regard to the first warning that was issued on March 2, 2015, you had mentioned about the fact that what was of concern to you that lead to the warning being issued was that she hadn't followed the policy and procedure about securing the drug out of PODIS, correct?

A. Correct.

Q. In this situation was the violation the fact that she had set up a medication that was then administered to a patient that hadn't been where the bar code had been scanned through the PODIS system?

A. Correct.

Q. Did Ms. Wells admit that she had not

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

* * *

KIMBERLY WELLS :
:
V. :
:
RETINOVITREOUS :
ASSOCIATES, LTD d/b/a :
MID ATLANTIC RETINA : NO. 15-0478

* * *

August 6, 2015

* * *

Oral deposition of JANET ELAINE WILLIS-SELLIER, held in the Law Offices of Weber, Gallagher, Simpson, Stapleton, Fires & Newby, LLP, 2000 Market Street, Suite 1300, Philadelphia, Pennsylvania 19103, commencing at 2:05 p.m., on the above date, before Hope Agosto, a Professional Court Reporter and a Notary Public.

* * *

R&K REPORTING, INC.
Court Reporting Services
PO Box 1372
Levittown, Pennsylvania 19058-1372
Phone (215) 946-7009 Fax (215) 949-1867

you get a written warning, it actually affects your bonus.

Q. Do you know whether there had been a verbal written warning to Ms. Wells before the one you were issuing on January 14, 2013?

MR. SEILER: Objection to the form. You can answer.

BY MS. WALSH:

Q. Do you know if there had been any prior warnings issued to Ms. Wells before the one you were issuing?

A. Not -- I have no idea if there was prior warnings.

Q. Did you initially prepare it as a written warning?

A. I did because I had talked to her several times about lack of disrespect, lack of completing tasks. We had multiple, multiple conversations about attitude and literally lack of respect, lack of sense of urgency. These are all verbal conversations.

Q. In terms of your description of attitude, could you describe what the experiences were that you had for which you

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY WELLS, Plaintiff, | : | CIVIL ACTION |
| | : | NO. 15-5675 |
| vs. | : | |
| RETINOVITREOUS ASSOCIATES, LTD. d/b/a MID ATLANTIC RETINA Defendant. | : | |

Bensalem, Pennsylvania

March 3, 2016

Pretrial examination of KRISTEN WINKELSPECHT, taken pursuant to notice, on behalf of the Plaintiff at the offices of Karpf, Karpf & Cerutti, P.C., 3331 Street Road, Bensalem, Pennsylvania, on the above date, commencing at 10:11 a.m., before Linda A. Ricciardi, Certified Court Reporter.

R&K REPORTING
Court Reporting Services
PO Box 1372
Levittown, Pennsylvania 19058-1372
Phone: 215-946-7009 Fax: 215-949-1867

you understand that means you have the same obligation to testify truthfully subject to penalty of perjury, the same as if you were inside of a courtroom testifying before a judge or jury?

A. Yes.

Q. The court reporter seated to your left is taking down everything that is being said in the room, so to make her life easier and make the record more clear try to give verbal responses as opposed to a nod of the head or uh-huh, okay?

A. Yes.

Q. It is also better for the court reporter if only one of us speaks at a time. So even though if you anticipate where I am going with my question, let me finish it and then you can start your answer, and I will give you the same courtesy and try to let you finish your answers before I begin my next question.

A. Okay.

Q. Sometimes my questions are bad and confusing, if you don't understand it just let me know, I will either rephrase it or ask a

different question, otherwise if you answer my question I will assume that you understood it and are responding to the question as I. Proposed it to you?

A. Okay.

Q. Are you under the influence of any medication or substance that would either impact your ability to testify truthfully or your ability to recall events?

A. No.

Q. Are you currently employed at Mid Atlantic Retina?

A. Yes.

Q. How long have you been employed there?

A. Seven and a half years.

Q. What is your current job title?

A. Ophthalmology tech.

Q. I will say op tech so it is easier, I can't pronounce that word.

A. Okay.

Q. How long have you been an op tech?

A. Since 1998.

Q. How long have you been an op tech at Mid Atlantic Retina?

A. Oh, at Mid Atlantic Retina, the whole seven and a half years except I was a manager for a little while.
Q. When were you a manager?
A. August of 2013 to October of 2015.
Q. Is there any reason why you ceased being a manager?
A. I decided I wanted to go back to school, and being a manager it was too much time, I didn't have time to go to school.
Q. So you weren't demoted for performance or anything like that?
A. No, I stepped down.
Q. So the majority of my questions today will most likely pertain to the period during which you were a manager, okay?
A. Yes.
Q. What were your job duties as a manager at Mid Atlantic Retina?
A. To oversee the clinical flow on the floor, which is the doctor seeing patients, the technicians getting the patients through to see the doctors.
Q. Did you have any supervisory

responsibilities?
A. Yes.
Q. Did you supervise other op techs?
A. Yes.
Q. Did you supervise any other positions besides op tech?
A. No, just the op techs on the floor.
Q. When you were a manager did you participate in the discipline of op techs?
A. Yes.
Q. Describe the extent of your participation in that discipline?
A. Most of the time if something would occur on the floor or while I was doing some of my reports I would then bring that to our director's attention, and we would go forward from there, if it needed to be written up, et cetera.
Q. Would the ultimate decision to discipline an op tech be yours?
A. I would say it is probably 50/50.
Q. 50 percent you and 50 percent your director?
A. Yes. I would take it to him and we

would decide together.

Q. When you were a manager did you participate in the process or decision to terminate op techs?

A. No.

Q. You would have participated in their discipline, right?

A. Yes.

Q. And their discipline would be considered in the decision to terminate?

A. Can I, I mean...

Q. You can answer to the best of your knowledge.

A. While I was there the few that were terminated I brought to the attention of my director, and he kind of handled it from there. I handled low level discipline.

Q. So what exactly would you bring to the attention of your director?

A. If there was an error done on the floor, if a medication wasn't covered or if there was some type of discrepancy or whatever I would take it to the director, and if it was a lower level of discipline, just like a verbal

or something like that I would make that decision with him, but usually if it was higher I kind of took it to him.

Q. Would you recommend or otherwise suggest that an op tech would be terminated when you were a manager?

A. While I was working I did not for the few that were there.

Q. So when you say a decision to terminate was handled by your manager, I am trying to understand what you presented him that lead to your decision to terminate?

A. Are you talking specific situation or in general?

Q. In general.

A. Because there was only two while I was there.

Q. If you can generalize what happened with those two, what would you present to the director, would it be the discipline that you were involved in?

A. If there were a situation, hypothetically say, I don't know, an error occurs on the floor, I would then take it to my

director and say X, Y, Z happened, we need to address this. And then we would decide on that employee, you know, according to what level of discipline.

If they've never been disciplined before, is it a verbal, is it someone who has, you know, has been disciplined a lot. That is why I always would go to him because he was my superior.

Q. So if I am understanding you correctly, you would provide input or information that would ultimately result in the termination, but it wasn't your final decision?

MS. WALSH: Objection. You can answer.

THE WITNESS: It wasn't my decision. I never said let's terminate this person. In the two situations that we had I did not recommend that.

BY MR. CHASE:

Q. In those two situations did you provide any input to the director?

A. With the lower level of discipline, yes.

Q. To your knowledge would that low level of discipline be considered in the decision to terminate?

A. All I can do is assume because I was not there when I discussed or when he discussed it. So I can't really tell you an answer on that because I don't know what they, I just know I was there for verbal writtens and like the low level. When it came to the decisions further up I wasn't involved in those.

Q. Would you be present when the op tech was informed that they were terminated?

A. Yes.

Q. What is the PODIS system, and I believe that is spelled P-O-T-I-S, right?

A. P-O-D-I-S system. It is Physician Office Drug Information System.

Q. What exactly is it?

A. What that is, it is a system where we get all of our medications in, our injectables, and they are put in the system with a bar code. So that way we can track everything, we can track what patient it goes to, we can track who signed it out, keeps our inventory and makes

sure that everything is, you know, there is no discrepancy.

Q. So it is some type of software program?

A. Yes.

Q. Was the PODIS system in place at the time you started at Mid Atlantic Retina?

A. When I started at Mid Atlantic Retina, no.

Q. Do you recall approximately when it was put in place?

A. I want to say like around May of 2013, May or June.

Q. Did Mid Atlantic Retina offer any type of formal training to op techs or other employees regarding how to use a PODIS system?

A. Yes.

Q. What was that formal training?

A. Our clinical director of operations, Candice, came out, and she trained us.

Q. What type of training was it?

A. Just on how to sign out a medication, how to put medications into the system.

Q. What is Candice's last name?

A. Leonardo.

bring the patient back or would you like to bring a sample so the patient doesn't have to leave and come back.

They would make that decision, and then I would go and talk to the patient.

Q. So it is fair say that at the first layer of communication in discharging patients it comes from the doctor; is that accurate?

A. Yes.

Q. When you were working at the Wills location were there situations where the doctor would tell the op tech to discharge a patient?

A. I can't say for sure.

Q. It may have happened, it may not have happened, you are not sure?

A. I had op techs come to me and say Dr. So and so said we could bring this patient back, and then I would go talk to the patient because sometimes the patients would get upset that they have to leave.

Q. So if a doctor tells an op tech to discharge a patient, is the op tech then required to come to you or some other supervisory employee?

A. Yes.
Q. Is there a written rule or policy setting forth that requirement?
A. It is not a written policy, but it was our practice. That is how we handled it.
Q. So if a doctor tells an op tech to discharge a patient and the op tech discharges the patient without coming to a supervisor, they are not breaking the rules, are they?
A. Depends on why they discharged the patient. We always made every effort to not have to discharge the patient.
Q. Well, if the reason they are discharging the patient because the doctor told them to and the op tech follows the doctor's instructions that is not a violation of the rules, right?
A. Depends on if the doctor knows the whole story or not. The doctor only has the information that is given to him by the op tech instead of myself.
Q. So the op tech discharging a patient at the direction of the doctor it could potentially not be a rule or violation? That

might be a confusing question. Do you understand that?

A. I guess, but I always ask them to always come to me.

Q. You always ask them you said?

A. Yes. I've always told them that if there is a situation with a patient you need to come to a manager.

That way I can talk to the patient and make sure that we have done everything in our power to make sure that they either get the care they need that day or if they do have to come back then I like to make sure that the appointment is set so that when they come back they don't have to wait because it is an inconvenience to the patient to have to leave when they came there expecting to be treated. Some of them don't have a ride.

Q. So if I understand you, you would ask the op techs to always come to you if there is a situation with the patient, but is there a written rule setting forth that request?

A. Not a written, no.

Q. It is not included in the employee

handbook anywhere?
A. I don't believe so.
Q. Is there any written rule or documented rule that requires an op tech to speak with a manager if they are unable to locate medication?
A. Not a written rule, but that was the practice. That is how -- we always went to your manager if you couldn't find the medicine.
Q. Was there any type of training that provided op techs with that instruction or was it just assumed they understood that practice?
A. My meetings, my monthly meetings.
Q. The substance of these monthly meetings were they reduced to writing?
A. No.
Q. Did you make any notes or documents or anything regarding these meetings and how frequently they occurred?
A. I did make agendas, but there wasn't signatures by everybody.
Q. What did you include on these agendas?
A. Just bullet points.
Q. Things you wanted to discuss?

A. Yes.
Q. Things that actually were discussed?
A. Right. For some of the meetings, not all of the meetings because we sometimes it would be okay, we have 10 minutes everybody get together.
Q. How often did you provide agendas for these meetings?
A. We did the meetings monthly but not all had agendas.
Q. Can you estimate how many meetings had agendas?
A. Maybe 50, 60 percent.
Q. Were these agendas handwritten?
A. No.
Q. You typed them on a computer?
A. Yes.
Q. Did you save the documents?
A. Yes.
Q. Do you still have access to the computer on which you saved these documents?
A. I believe so.
Q. Did you produce these agendas to your attorney in the course of this litigation?

A. No.
Q. Do you believe that any of these agendas actually include the policy concerning speaking to managers before either discharging a patient or being unable to locate a medication?
A. I will have to look them up.
Q. So you are not sure?
A. I can't. I don't want to say yes or no until I look them up and see, but I will definitely get them.
Q. So you understand we are here today because of a lawsuit that was filed by Kimberly Wells, right?
A. Yes.
Q. Do you understand that she also filed a lawsuit prior to this in or around February 2015?
A. Yes.
Q. I will just refer to the prior lawsuit as the February lawsuit. When did you first become aware of the February lawsuit?
A. Sometime the beginning of March.
Q. 2015?

A. Yes.
Q. How did you become aware of it, who told you?
A. We were -- I believe it was my director.
Q. What is his or her name?
A. Ed Weber.
Q. He told you personally?
A. Yes.
Q. Was anybody else present when he told you?
A. No.
Q. What did Ed Weber tell you?
A. Just that we were going to be having a meeting.
Q. Did he tell you what the meeting was going to be about?
A. Just vaguely that there was a lawsuit or a case, I can't remember the exact words that he used.
Q. Did you have this meeting on the same day he told you?
A. No, it was a week or two later.
Q. Who else was present at this meeting

that was one or two weeks later?
A. Myself, Ed, Rhonda and our attorney.
Q. What is Rhonda's last name?
A. Ceretelle.
Q. Do you recall the attorney's name who was present?
A. Brett.
MS. WALSH: It was our law office.
MR. CHASE: Okay.
BY MR. CHASE:
Q. So since your attorney was present I am not going to ask you what was said during that meeting.
Prior to August 2013 you were actually at the Wills location, right?
A. No, I was not.
Q. Did you ever work there at any point prior to August 2013?
A. No.
Q. Starting in August 2013 were you directly supervising Kimberly Wells?
A. Yes.
Q. Between August 2013 and the beginning of March 2015 was Kimberly Wells subject to any

written discipline at Mid Atlantic Retina?

A. Written discipline wasn't until the end of February I believe.

Q. How about verbal?

A. Verbal, we had numerous conversations.

Q. You had conversations, were they discipline related?

A. Document, I made notes of her attitude and mistakes.

Q. How many mistakes did she make between August 2013 and March 2015?

A. I probably had at least two conversations with her about mistakes.

Q. Is there any reason she wasn't subject to written discipline during that time frame?

A. I was a new manager coming on, I was trying to build a positive relationship and trying not to come in and being, you know.

Q. I don't know.

A. I didn't want to come in like this, you know, mean manager, you know. Trying to, you know, I was trying to build a relationship so I was trying to give everybody a chance and verbally talk to them, train them.

Q. You said the first written discipline that Kimberly Wells received was around March 2015?

A. I believe it was the end of February.

Q. Do you recall if that was before or after you learned of the February lawsuit?

A. It was before.

Q. I will get into the specifics of the discipline later, but before I get there, do you recall the specific reason or reasons that contributed to Kimberly Wells' termination from Mid Atlantic Retina?

A. With medications there were times where it wasn't circled on our fee slip, which means it didn't get billed to the patient, and when I would do my reports that is when I would find that medication was outstanding and wasn't billed.

Q. So just to translate what you said, there were errors with the billing slip regarding medication, and that is the reason she was terminated?

A. Yes.

Q. Any other reason?

A. You said my beginning of writing up.

MS. WALSH: That is not what he asked. I'm sorry, I didn't mean to interrupt. He asked about termination.

BY MR. CHASE:

Q. Specifically the reason or reasons that contributed to Ms. Wells' termination, if you are aware of more than one then list them?

A. Yes.

Q. The fee slip issue?

A. A few times. There was a patient that the wrong eye was prepped, and the medication was signed out for the wrong eye.

Q. Okay. Were there any other contributing factors?

A. Then there was, I am trying to think of the other one. There was either once or twice there was medication where a regular purchased medicine was given instead of the correct specialty pharmacy, which is a patient specific drug that is sent to us directly for them.

Q. So for those reasons you gave me that contributed to Ms. Wells' termination, did she receive written discipline for each one?

A. Yes.
Q. Were you involved in each of those written disciplines?
A. Yes.
Q. Do you know who made the final decision to terminate Ms. Wells' employment?
A. I don't know specifically who.
Q. Were you present during any meeting that occurred at the time of Ms. Wells' termination; in other words, were you present when she was told she was being terminated?
A. Yes.
Q. Who else was present?
A. Myself, Shelley and Ed Weber.
Q. So during this, I will call it the meeting when Ms. Wells was terminated, were any of those prior disciplines that you issued discussed or referenced?
A. I believe so.
Q. Who actually told Ms. Wells that she was terminated?
A. Ed did.
Q. So would it be fair to say that the discipline that you issued to Ms. Wells

Q. If you could turn to the last page, I believe it is five pages total, the last one marked on the bottom right-hand corner MAR 0073?
A. Uh-huh.
Q. Is that the termination document concerning Kimberly Wells?
A. Yes.
Q. See where it says documented by, is that your signature?
A. Yes.
Q. Who is that underneath your signature, director of clinical operations?
A. Edward Weber.
Q. This reflects a signing date of July 10, 2015. Does that refresh your recollection as to when the termination meeting occurred concerning Kimberly Wells?
A. Yes.
Q. In the top one-third of the page where it lists previous warnings, there are about four different disciplinary actions listed there.
A. Yes.

Q. Were those all factored into the decision to terminate Kimberly Wells?
A. I wasn't involved in the meetings, but I am assuming so.
MS. WALSH: Don't guess. One of the instructions is not to guess so please don't guess.
THE WITNESS: I don't know.
BY MR. CHASE:
Q. When you say you weren't involved in the meetings, what meetings?
A. You asked me if I was involved in the meeting to terminate her and I was not.
Q. I thought you said you weren't aware whether or not there were meetings? I am confused now.
A. Somehow they had to come to a decision, I was not part of that decision.
Q. So why were these previous warnings listed on here if they weren't considered in the decision to terminate?
MS. WALSH: Objection.
THE WITNESS: Because we always list where it says previous warnings.

mischaracterizes the testimony but.

THE WITNESS: Not friendly, but trying to build a relationship.

BY MR. CHASE:

Q. You didn't want to come off as a mean boss, right?

A. Per se.

Q. Per se, yes or no?

A. Yes.

Q. So what occurred around March 2, 2015 that changed your approach?

MS. WALSH: Objection, mischaracterizes the testimony. You can answer.

THE WITNESS: It didn't change my approach, there wasn't any drug problems with her before that.

BY MR. CHASE:

Q. None whatsoever?

A. There was, like I said, the two verbal conversations.

Q. What were those conversations about?

A. About you need to sign the medicine out before you give it to the patient, you need to

make sure you circle it on the fee ticket.

And I would verbally do that to try to give them a little extra training, a reminder to not make those mistakes in the future.

Q. So these conversations about signing out the medication, that is related to drug, right, a drug problem?

A. Yes.

Q. Those conversations about signing out the fee ticket occurred before March 2, 2015, right?

A. Yes.

Q. So if I can draw your attention to the March 2, 2015 discipline, under where it says infraction, I am not going to read the entire thing, but I assume you had the opportunity to read that, right?

A. Yes.

Q. It says drug was set aside by manager, in parenthesis Kristen. Would that be you?

A. Yes.

Q. Is part of the op techs' duties to pull drugs before they are administered to the patient?

A. Yes.
Q. So in this case why would you have pulled one aside?
A. There was just -- the way they were arranged in the refrigerator, there were specialty pharmacy, which specialty pharmacy is patient specific, means the pharmacy sends us a certain medication with that patient's name on it.
We had a specific fridge with those medications in them.
Q. Were the op techs aware of the specific fridge?
A. Yes.
Q. So what exactly was the reason for pulling the medication if the op tech was aware of the fridge concerning the specialty medication?
A. They have to go to the fridge and pull the medicine to give to the patient.
Q. Why did you pull it out instead of letting the op tech do it?
A. I did not pull it out. The drug was set aside. That meant in the refrigerator, we

had different areas in the refrigerator, certain medications were here, by brand.

Q. So you set it aside in the refrigerator?

A. Yes.

Q. There is reference to a Chris Lallo in that same paragraph?

A. Yes.

Q. Who is she?

A. She was the op tech that ordered all the specialty pharmacy and got the approval for the patients.

Q. Did she have supervisor authority over Kimberly Wells?

A. No.

Q. Then the handwritten notes underneath employee comments, I don't know if you recognize that handwriting, but do you believe that to be Kimberly Wells' handwriting?

A. Yes.

Q. Starting in the second line down it says, when I asked Chris Lallo where the patient's drug was for specialty formula she stated that we were not to use, and use regular

purchase. Do you have any idea what that is in reference to?

A. She said that she went to Chris Lallo. Chris Lallo then told me that she had told Kim to come to me on what drug to use.

Q. Do you have any idea why Chris Lallo would be giving instructions or directions to somebody she doesn't supervise?

A. Kim went to her because, to Chris Lallo, because Chris Lallo is the one that orders and handles all the specialty drugs. When Kim came to her Chris Lallo knew that it wasn't a situation that Kim should have been coming to her for and sent her to her manager, which she did not do.

Q. Do you know if Chris Lallo did, in fact, tell Ms. Wells that she was not to use a specialty drug as noted in the document?

A. She told me she did not say that to her.

Q. Did Kim Wells tell you that Chris Lallo said that to her?

A. That is what she wrote there.

Q. Did you speak with her about this

the drug out of the PODIS system. What does that mean, what was that infraction?

A. If she had tried to take the medication out of PODIS before giving it to the patient it would have alerted her to not give that medication. It would not have let her sign it out, it would need a manager's override.

Q. So the fact that Ms. Wells had pulled a drug and then had that drug prepared and eventually administered by the physician to the patient without having secured that drug through the PODIS system, what was the problem that meant this was an infraction pursuant to MAR's policies and practices in having done it that way?

A. That she did not come to me and she did not follow our policy, our common practice.

Q. What was the policy and practice with regard to the PODIS system when it comes to the securing of drugs, what was supposed to be done by an op tech?

A. First you would make sure it is always covered. You always had to sign it out of PODIS before opening it, drawing it up for the

patient to make sure that you are giving the right dose, the right medication. That's what PODIS was set up to do.
Q. How would it be checked out through the PODIS system, the drug, what physically needs to be done by the op tech?
A. You have to scan the bar code, you put in a password, you scan the bar code, you put in a patient, a diagnosis, then you hit the button and PODIS will say they need specialty pharmacy, you are giving the wrong dose, you are doing the wrong eye, it is too soon to give an injection.
Q. So in this case did Ms. Wells go through that process pursuant to Mid Atlantic Retina's policy and practice that you just described with this particular medication?
A. No, she did not.
Q. Prior to February of 2015 you had been in the managerial position there at the Wills location for some period of time where Ms. Wells was working as an op tech, correct?
A. Yes.
Q. Prior to February of 2015 were you

aware as to whether Ms. Wells had, in fact, been using the PODIS system and whether she knew that she needed to assign the drug and secure it through the PODIS system?
A. Yes.
Q. You were physically aware of that by way of your observations and working with her for about a year and a half; is that correct?
A. Yes.
Q. So with respect to the first warning that was issued on March 2, 2015, the infraction by the way, when was it?
A. February 25th.
Q. The date that the infraction took place, was that before you knew about the lawsuit?
A. Yes.
Q. Even if you put aside for a moment the fact that Ms. Wells had not communicated with you with regard to this situation, was the fact that she had secured a medication without securing it through the PODIS system a violation in and of itself?
A. Yes.

Q. With respect to the second warning that was issued on the next page, which was dated, I am sorry the signature, when it was presented is dated March 20, 2015, correct?
A. Yes.
Q. You were asked about the first part of the infraction. How many infractions were listed here?
A. One prior. You are talking about the prior?
Q. No, not the prior. I mean within this actual warning itself.
A. Three.
Q. The first one was the only one you were asked about in this deposition so far, correct?
A. Yes.
Q. That had to do with the discharge of the patient without communicating with you, correct?
A. Yes.
Q. In fact, was the medication that Ms. Wells did not speak to you about, was it, in fact, available and there at the Wills location that day?

A. Yes, it was.

Q. Would she have come to learn that if she had, in fact, communicated with her supervisor?

A. Yes.

Q. Do you recall how the situation, and I just mean the method by which, involving this medication that day, how it came to your attention?

A. This one, I believe it was Kim Wells came to me.

Q. The first one on the prior page that you were questioned about, the first warning, how was that one brought to your attention, the situation itself?

A. The first one Chris Lallo came to me and asked if Kim had come to me about a situation with a drug.

Q. In the next one you believe it might have been Ms. Wells but somehow you became aware that patient had been discharged and told that there wasn't the medication available there but, in fact, it was?

A. Yes, it was.

Wells had been responsible for?
A. Yes. I can go into PODIS and it tells me who signed the medication out.
And my schedule reflected that she was working in there that day, and PODIS had her name that she signed the drugs out to those patients.
Q. As far as these fee slips were concerned, when you were the clinical manager at the Wills location what was your responsibility and your practice in terms of reviewing fee slips?
A. Every day I had to review the day or two prior, all the billing, whether it was injections that were given, photos that were taken, and I had to get the list of all the drugs that were assigned out for that day from PODIS and match them up against the print out from the billers on what they billed, and would match up what was billed versus what was assigned, and that is how we would make sure that everything was accounted for.
Q. In doing that were you reviewing fee slips and what was signed out of PODIS by every

op tech that worked at that location?

A. Yes.

Q. The next document in this package that was marked KW-1, this is a suspension notice. Am I correct, that was issued on April 20, 2015?

A. Yes.

Q. Ms. Winkelspecht, did you participate in the investigation and/or -- let's start with that, did you participate in the investigation of this incident?

A. No.

Q. Did you participate in any decision with regard to the actual issuance of this suspension?

A. No.

Q. Did you sign it?

A. Yes.

Q. Did you sign it because you were present at the meeting when it was presented?

A. Yes.

Q. Was it the practice at that time where the manager and the director of clinical operations would meet with the employee and

present whatever disciplinary action was being presented if it was in writing?

A. Yes.

Q. So in this case of the suspension was your involvement solely in being at the meeting where the suspension was presented?

A. Yes.

Q. What knowledge did you have about this incident taking place, how did that come to your attention?

A. I was working on the floor, and one of the op techs came to me and said she had a patient in her room that had a complaint. I was very busy on the floor that I asked them to grab Ed and have him go in because I could not leave the floor at that time.

Q. Was that the extent of your involvement in this situation?

A. Yes.

Q. Did Ms. Wells provide any factual rebuttal, either in person at the meeting or provide any written comments in the employee comment section at the meeting where the suspension notice was presented?

A. No.
Q. In your experience as the manager at the Wills location had you, in fact, been involved in issuing any written disciplinary action to any other op techs besides Ms. Wells?
A. Yes.
Q. On the forms that were used with any other op techs did they have a section for previous warnings like the ones we see here marked KW-1?
A. Yes.
Q. Was it the practice at the location that you were at at Wills to list in the previous warnings box any previous warnings, if there were?
A. Yes.
Q. That was the case for any op tech?
A. Yes.
Q. How about with regard to any employee even at the Wills location?
A. Yes.
Q. The same forms were used?
A. Yes.
Q. With regard to the written warning that

was issued on May 1 of 2015, the infraction on April 28, 2015 regarding failure to follow procedure, am I correct that this infraction involved a preauthorization through insurance before an injection was administered to a patient?

A. Yes.

Q. Other than Ms. Wells, had you ever had any situations while you were the manager at the Wills location where any op tech was similarly issued a disciplinary action for not following procedure when it came to pre authorizations?

A. Yes.

Q. With regard to the category of infraction that was on the prior warning before the suspension that had to do with correctly coding or accurate coding on fee billing slips, had you ever been involved with issuing any disciplinary action to any op techs for any fee slip billing errors?

A. Yes.

Q. The July 10, 2015 termination notice, the infraction that was committed there was

that an infraction that Ms. Wells had been issued any warning for previously, that type of infraction?

A. Yes.

Q. When was that?

A. The ones prior, the second one, the 3/20 I believe, yes, on 3/20.

Q. Did the fact that you became aware sometime in March of 2015 that Ms. Wells had filed a lawsuit against Mid Atlantic play any role in your management and your oversight of Ms. Wells as an op tech at the Wills location?

A. No.

Q. Did the fact that Ms. Wells had filed a lawsuit in February of 2015 that you became aware of sometime in March of 2015 against Mid Atlantic Retina play any role in your disciplinary actions that you were involved in with regard to Ms. Wells?

A. No.

Q. Did the fact that Ms. Wells had filed a lawsuit in February of 2015 that you became aware of in March of 2015 play any role in your supervision of Ms. Wells as an op tech and any

and all actions that you took with regard to your management of Ms. Wells, did the fact that that lawsuit was filed and that you were aware of it play any role in your management of her?

A. No.

Q. I have no questions. Counsel may have questions.

MR. CHASE: Yeah, a few.

-----

EXAMINATION

-----

BY MR. CHASE:

Q. The conversations you had with Ms. Wells that predated May 2015 they were fee slip issues?

A. One was about a fee slip and the other was making sure the drug is signed out of PODIS prior to giving it to the patient.

Q. Neither of those resulted in any written disciplinary action?

A. No.

Q. Is it fair to state that some of the disciplinary action issue that was documented concerned fee slip and signing out of PODIS

issue, right?
A. Yes.
Q. That is all.

-----

(Witness excused.)

(Deposition concluded at 1:08 p.m.)

CERTIFICATION

I, Linda A. Ricciardi, hereby certify that the foregoing is a true and accurate transcript of the deposition of KRISTEN WINKELSPECHT, who was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

______________________________

Linda A. Ricciardi
Court Reporter and Notary Public

Kimberly Wells vs. Retinovitreous Associates
USDC ED of PA 15-5675
March 3, 2016 Linda Ricciardi, PCR

ACKNOWLEDGEMENT OF DEPONENT

I, KRISTEN WINKELSPECHT, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on this errata sheet.

____________________ ____________________
(Date) KRISTEN WINKELSPECHT

ERRATA SHEET

PAGE LINE CHANGE

____ ____ ________________________________

Reason for change: ______________________________

____ ____ ________________________________

Reason for change: ______________________________

____ ____ ________________________________

Reason for change: ______________________________

____ ____ ________________________________

Reason for change: ______________________________